1

2

3

4

5

6

7                     UNITED STATES DISTRICT COURT

8               FOR THE EASTERN DISTRICT OF CALIFORNIA

9
LINCOLN GENERAL INSURANCE
10 COMPANY,

11                                     NO. CIV. S-07-1015 LKK/EFB
            Plaintiff,
12
        v.
13                                         O R D E R
ACCESS CLAIMS ADMINISTRATORS,
14 INC., and DOES 1 through 75,
inclusive, et al.,
15
            Defendants.
16 _____/

17      This is an action brought by an insurance company against its

18 corporate claims administrator over the alleged mishandling of a

19 claim arising from an automobile accident.   Pending before the

20 court is defendant's motion to transfer and motion to dismiss.   For

21 the reasons set forth below, the court denies the motion to

22 transfer, and grants the motion to dismiss with respect to the

23 negligence and negligent misrepresentation claims but denies the

24 motion to dismiss with respect to the breach of contract, good

25 faith and fair dealing, and fraud claims.

26 ////

                                  1

# I. Background

This is a lawsuit between a Pennsylvania insurer, Lincoln General Insurance Company ("Lincoln"), whose headquarters are located in Pennsylvania, and a claims administrator, Access Claims ("Access"), whose headquarters are located in Georgia.  Compl. ¶¶ 1-2.  Pursuant to a claims service agreement, Access administered claims for Lincoln's California insurance policies.  Compl. ¶ 6. Lincoln has now filed suit against Access for its alleged mishandling of a claim that arose out of an automobile accident and a subsequent third-party personal injury claim.  The complaint alleges five causes of action: (1) breach of contract, (2) breach of good faith and fair dealing, (3) negligence, (4) fraud/intentional deceit, and (5) negligent misrepresentation.  The action was originally filed in San Joaquin County Superior Court and later removed by Access to this court.

Lincoln originally issued an auto liability insurance policy to Manuel Coleman, a California resident, with a coverage limit of $30,000 for bodily injuries resulting from a single auto accident. Coleman was then involved in an accident in California with Diana Dias and her husband, who are also California residents.  Diana Dias claimed that she was paralyzed as a result of the accident and sued Coleman in San Joaquin County Superior Court.  Pursuant to the claims service agreement between Lincoln and Access, Access handled the defense of the Dias lawsuit, including the retention of three California lawyers to defend the lawsuit on Coleman's behalf. Lincoln alleges that Access handled the defense of the Dias lawsuit

2

1   inappropriately and exposed Lincoln to damages far in excess of the
2   $30,000 policy limits.

3       Specifically, Lincoln claims that Access failed to respond in
4   a timely manner to a time-limited demand letter from Dias' counsel
5   asking for the $30,000 policy limits.  Compl. ¶ 12.  Lincoln also
6   alleges that Access withheld the existence of the Dias claim and
7   Access' mishandling of the same from Lincoln.   According to
8   Lincoln, it only learned of the Dias claim as a result of an
9   internal file audit.  Compl. ¶¶ 9-11, 12, 14.  Lincoln alleges that
10  when it learned of the potential exposure of liability, it chose
11  to participate in the settlement process directly and thereafter
12  settled the Dias claim for $3.8 million.  Decl. of Tim Kirk, ¶¶ 5-
13  6.  The mediation and settlement process took place in California.
14  Id.  ¶¶ 7-13.   Access, however, maintains that all of its
15  administration of the Dias claim occurred in Georgia at Access'
16  office.  Decl. of Michael Meadows ¶ 4.

17                          **II. Standard**
18  **A. Motion to Transfer**

19      For the convenience of parties and witnesses, a district court
20  may transfer any civil action to any other district or division
21  where it might have been brought if to do so is in the interest of
22  justice.  28 U.S.C. § 1404(a).  The defendant must make a strong
23  showing of inconvenience, however, to warrant upsetting plaintiff's
24  choice of forum.  Decker Coal Co. v. Commonwealth Edison Co., 805
25  F.2d 834, 843 (9th Cir. 1986).  The relevant factors in this
26  inquiry include plaintiff's choice of forum, convenience to the

1  parties, convenience to the witnesses, ease of access to evidence,

2  familiarity of the forum with applicable law, feasibility of

3  consolidation with other claims, local interests in the

4  controversy, and court congestion.  Williams v. Bowman, 157 F.

5  Supp. 2d 1103, 1106 (N.D. Cal. 2001).

6  **B. Motion to Dismiss**

7       On a motion to dismiss, the allegations of the complaint must

8  be accepted as true.  See Cruz v. Beto, 405 U.S. 319, 322 (1972).

9  The court is bound to give the plaintiff the benefit of every

10 reasonable inference to be drawn from the "well-pleaded"

11 allegations of the complaint.  See Retail Clerks Intern. Ass'n,

12 Local 1625, AFL-CIO v. Schermerhorn, 373 U.S. 746, 753 n.6 (1963).

13 Thus, the plaintiff need not necessarily plead a particular fact

14 if that fact is a reasonable inference from facts properly alleged.

15 See id.; see also Wheeldin v. Wheeler, 373 U.S. 647, 648 (1963)

16 (inferring fact from allegations of complaint).

17      In general, the complaint is construed favorably to the

18 pleader.  See Scheuer v. Rhodes, 416 U.S. 232, 236 (1974).  The

19 court may not dismiss the complaint if there is a reasonably

20 founded hope that the plaintiff may show a set of facts consistent

21 with the allegations.  Bell Atlantic Corp. v. Twombly, 127 U.S.

22 1955, 1967-69 (2007).  In spite of the deference the court is bound

23 to pay to the plaintiff's allegations, however, it is not proper

24 for the court to assume that "the [plaintiff] can prove facts which

25 [he or she] has not alleged, or that the defendants have violated

26 the . . . laws in ways that have not been alleged." Associated

4

1  General Contractors of California, Inc. v. California State Council
2  of Carpenters, 459 U.S. 519, 526 (1983).

3                            **III. Analysis**

4  **A. Motion to Transfer**

5       The court may transfer a civil action to any other district
6  where it might have been brought for the convenience of the parties
7  and witnesses and in the interest of justice.  28 U.S.C. § 1404(a).
8  As an initial matter, the plaintiff's choice of forum is typically
9  entitled to considerable weight, but may be lessened where the
10 plaintiff's choice is not its residence.       Inherent.com v.
11 Martindale-Hubbell, 420 F. Supp. 2d 1093, 1099 (N.D. Cal. 2006).
12 Here, Access maintains that transfer is appropriate because of (1)
13 convenience of the parties, (2) convenience of the witnesses, (3)
14 ease of access to evidence, (4) familiarity of each forum with the
15 applicable law, (5) the absence of a significant California
16 interest in the controversy, and (6) relative court congestion.

17      **1. Convenience to Parties**

18      First, with regard to convenience of the parties, it appears
19 that Georgia would be more convenient to Access, whereas California
20 would be more convenient for Lincoln.  Access is located in the
21 Northern District of Georgia.  It is unclear whether Access has or
22 ever had any California offices, although, at the very least, it
23 is licensed as an insurance adjuster in California.  Lincoln, on
24 the other hand, is based out of Pennsylvania, but contends that it
25 has offices in California.

26      Clearly, the fact that suit would be more convenient for

Access in Georgia, does not mean it can shift the inconvenience to the plaintiff.  The relevant question is whether, if the motion to transfer were granted, the added convenience to Access of defending this case in Georgia would be greater than the added inconvenience to Lincoln of prosecuting this case in Georgia.  Given that Access is based out of Georgia, whereas Lincoln's principal place of business is in neither Georgia nor California, the court concludes that the overall convenience to the parties would be promoted, albeit marginally, by transfer.

**2. Convenience to Witnesses**

With regard to convenience to witnesses, it is likely that important witnesses to this action -- the Access employees who were involved in the alleged mishandling of the Dias claim -- are located in Georgia.  Nevertheless, Access has not quantified how many of these witnesses exist.  Lincoln, on the other hand, claims that there are at least ten witnesses located in California who may be called upon to testify.  They include a Lincoln employee who was involved in the settlement of the Dias claim, several lawyers involved in the settlement, Manuel Coleman, and Diana Dias and her husband.

The relevance and admissibility of the testimony of these witnesses is in dispute.  For example, Lincoln maintains that Access will argue that it did not know about or consent to Lincoln's settlement of the Dias claim, and that, as a result, Lincoln will have to put on the California lawyers involved in the settlement to show that Access had knowledge of the settlement.

1  Access responds that none of these witnesses have personal
2  knowledge of the central facts in dispute -- how Access handled the
3  Dias claim -- and that their testimony would either be barred by
4  attorney-client privilege or would be cumulative of other
5  testimony. Furthermore, Access maintains that testimony by Coleman
6  or Dias would be irrelevant, because the facts of the accident are
7  not in dispute.  The reasonableness of the settlement, however, is
8  in dispute.  As to that matter, these witnesses' testimony would
9  indeed be relevant.

10      In sum, there appears to be, on one side, a handful of
11 potential California witnesses who may testify as to various issues
12 balanced against, on the other side, an unknown number of Access
13 representatives and adjusters who will testify as to other issues.
14 Because it is unclear how many Access employees will be called upon
15 to testify, it is impossible for the court to assign any particular
16 weight to the alleged inconvenience to Access employees.  Because
17 it is Access' burden to show the propriety of transfer, the court
18 finds that this factor weighs against transfer.

19      **3. Ease of Access to Evidence**

20      With regard to ease of access to evidence, there is little
21 dispute that transfer would be more efficient for Access, given
22 that information related to the Dias claim is located in its
23 offices in Georgia.  Transfer would have no effect on Lincoln,
24 however, because its relevant information is housed in its offices
25 in Pennsylvania.  Accordingly, the overall ease of access to
26 evidence would be promoted by transfer.  This issue, however, is

1  not of significant import since all that appears to be involved is
2  the transport of relevant documents.

3      **4. Familiarity of Each Forum with Applicable Law**

4      The parties dispute whether Pennsylvania or California law
5  applies to Lincoln's claims.  This dispute is immaterial for
6  purposes here, however, because there is no reason to believe that
7  a Georgia court would be more familiar with adjudicating either
8  Pennsylvania or California state law claims than a California
9  court.  Accordingly, this factor does not weigh in favor of
10 transfer.

11     **5. Local Interest in Controversy**

12     Access maintains that there is only an attenuated local
13 interest in the controversy because the present dispute is one
14 between Georgia and Pennsylvania companies.  Furthermore, Access
15 points out that while the automobile accident occurred in
16 California and involved California residents, none of those
17 individuals are party to suit.  In addition, Access argues that the
18 conduct that gave rise to suit -- the alleged improper
19 administration of the Dias claim -- occurred in Georgia, at Access'
20 offices.[1]  Meadows Decl. ¶ 4.  The harm of that conduct was
21 allegedly felt by Lincoln General in terms of exposure to liability
22 and therefore had no specific geographic locus.

23     Nevertheless, Access is also a California-licensed claims
24 adjuster and, at least in the past if not present, conducted

25 ─────────────────

26     [1] Interestingly, however, Access does not argue in its motion
   to dismiss that Georgia law should apply to the claims at issue.

8

1  business in California.   Although the specific action that gave

2  rise to this suit may not have occurred exclusively in California,

3  it would not have occurred but for the fact that Access was

4  licensed to adjust California insurance policies.   The parties'

5  dispute in fact arose from Access' conduct in adjusting Lincoln's

6  California policies.   Furthermore, the litigation and settlement

7  of the Dias lawsuit apparently occurred in California.[2]

8      The legally relevant question is whether there exists a "local

9  interest in having localized controversies decided at home" -- not

10 whether there is an exclusively local interest in the controversy.

11 Decker, 805 F.2d at 843.   Accordingly, while the present

12 controversy may have connections with more than one state, there

13 is nevertheless a distinct local interest in the controversy.[3]

14 ////

15 ////

16

_____

17    [2]  The court recognizes that the facts surrounding the
   litigation and settlement of the Dias lawsuit are relevant to some,
18 but not all, of plaintiff's case.   First, these facts are relevant
   to the extent that Access' conduct in the settlement at least
19 partially forms the factual basis for some of Lincoln's claims.
   For example, the breach of contract claim asserts that Access
20 breached the parties' agreement not only by failing to timely
   respond to Ms. Dias' demand letter but also "[b]y failing to
21 properly coordinate, direct and manage litigation activity."
   Compl. ¶ 21(c).   Second, the facts surrounding the litigation and
22 settlement of the Dias lawsuit would be relevant to proving that
   Lincoln is entitled to recover the money it paid to settle the Dias
23 claim and that the amount of the settlement, $3.8 million, was
   reasonable.   Compl., Prayer for Judgment.
24

25    [3]  Indeed, whether the settlement paid by Lincoln was
   appropriate under California's bad faith law is distinctly an issue
   that deals with California's insurance law and the interests
26 protected by it.

9

1      **6. Relative Court Congestion**

2          While this court has the heaviest caseload per active judge

3   in the United States, this factor does not weigh significantly on

4   either side of the motion to transfer.  This court has a median of

5   10.9 months to resolve cases and 26 months to trial compared to 9.1

6   months to resolve cases and 24.8 months to trial for the Georgia

7   court.   A difference of one or two months is not sufficient to

8   demonstrate the propriety of transfer.

9          In sum, Access has shown that transfer would promote its own

10  convenience   and   improve   ease   of   its   access   to   evidence.

11  Nevertheless, Access has not shown that transfer would promote the

12  convenience of the witnesses, that a California court would be less

13  familiar with the applicable law, or that there is significantly

14  greater court congestion here relative to Georgia.   Furthermore,

15  both California and Georgia appear to have some interest in the

16  controversy: on the one hand, the controversy arose from Lincoln's

17  agreement with Access to adjust its California insurance policies,

18  and the settlement of the Dias lawsuit occurred in California, but,

19  on the other hand, the alleged mishandling of the Dias lawsuit

20  apparently occurred in Georgia at Access' offices.   Accordingly,

21  this factor does not weigh in favor of or against transfer.   While

22  a close issue, the court finds that this Access has not made the

23  required "strong showing," Decker, 805 F.2d at 843, and denies the

24  motion to transfer.

25  ////

26  ////

**B. Motion to Dismiss**

 **1. Choice of Law**

  In adjudicating Access' motion to dismiss, the first issue to be addressed is the applicable state law.  A federal court sitting in diversity applies the choice of law rules of the forum state.  Klaxon v. Stentnor Elec. Mfg. Co., 313 U.S. 487 (1941).  Under California's choice of law rules, a choice of law provision is enforceable where the designated state has a substantial connection to the parties or the dispute, or where there is some other reasonable basis for the choice.  Nedlloyd Lines B.V. v. Superior Ct., 3 Cal. 4th 459, 466 (1992).  If the chosen state's law conflicts with a fundamental policy of California, the court must also determine whether California has materially greater interests than the chosen state in the determination of the particular issue.  Id. at 466.

  Here, the agreement between the parties provides that "[t]his Agreement shall be interpreted and construed in accordance with the laws of the State of Pennsylvania."  Ex. A, Section III.  Access argues that this clause indicates that the parties intended for Pennsylvania law to apply in the event of a dispute arising from the contract.  Lincoln, however, maintains that the terms "interpret" and "construe" mean that Pennsylvania law applies in the interpretation and construction of the agreement, but not claims that might otherwise arise.

  Accordingly, the court must determine the meaning and scope of the choice of law clause.  In conducting this analysis, the

1  court is bound by Pennsylvania law.  See Nedlloyd, 3 Cal. 4th at

2  469, n.7 (noting that choice of law clause applies in interpreting

3  clause itself).  Here, there is no Pennsylvania case law directly

4  on point.  The one case cited by Access involved a choice of law

5  provision similar to the one at issue here, but that court merely

6  assumed  (and  the  parties  did  not  appear  to  dispute)  that

7  Pennsylvania law should apply to the claims.  See Bishop v. GNC

8  Franchising LLC, 403 F. Supp. 2d 411, 415 (W.D. Pa. 2005) (applying

9  Pennsylvania law to claims where agreement was to be "interpreted

10 and construed under the laws of the Commonwealth of Pennsylvania").

11      Several courts that have confronted a similar issue, however,

12 have held that the words "construe" and "interpret" are narrow, and

13 apply only to the construction and interpretation of the contract.

14 For example, in America's Favorite Chicken Company, the court found

15 that a choice of law provision stating that the agreement was to

16 be "interpreted  and  construed  under  the  laws  of  the  State  of

17 Louisiana" did not require application of Louisiana law to the

18 plaintiff's  claims.  America's  Favorite  Chicken  Co.  v.  Cajun

19 Enterprises, Inc., 130 F.3d 180, 182 (5th Cir. 1997) ("On its face,

20 the choice of law clause is restricted to the interpretation or

21 construction of the [] agreements. . . . Since the [] claims do not

22 implicate the interpretation or construction of the [] agreements,

23 they are not governed by the narrow choice of law clause present

24 here.") (emphasis in original).  See also Caton v. Leach Corp., 896

25 F.2d 939, 942-43 (5th Cir. 1990) (provision that agreement shall

26 be "construed under the Laws of State of California" was narrow and

12

1  did not govern claims for tort that did not arise out of

2  contract).[4]

3      Similarly, in <u>Dollar Systems</u>, the Ninth Circuit held that

4  where the choice of law provision stated that it would be

5  "construed in accordance with" the laws of a particular state, but

6  the claims at issue did not depend on the construction of the

7  agreement, the choice of law provision had no force.  <u>Dollar</u>

8  <u>Systems, Inc. v. Avcar Leasing Systems, Inc.</u>, 890 F.2d 165, 170

9  (9th Cir. 1989).

10     When contracting parties wish that all disputes arising from

11 their relationship be subject to a particular state's law, they

12 must use language indicating as much.  In <u>Nedlloyd</u>, the California

13 Supreme Court noted that "[t]he phrase 'governed by' is a broad one

14 signifying a relationship of absolute direction, control, and

15 restraint.  Thus, the clause reflects the parties' clear

16 contemplation that 'the agreement' is to be completely and

17 absolutely controlled by [the foreign jurisdiction's] law."

18 <u>Nedlloyd</u>, 3 Cal. 4th at 469.  <u>See also</u> <u>Boat Town U.S.A., Inc. v.</u>

19 <u>Mercury Marine Division of Brunswick</u>, 364 So. 2d 15, 17 (Fla. App.

20 1978) ("The difference between 'interpretation' and 'govern' is

21 ─────────────────

22     [4] These two Fifth Circuit cases did not address a seemingly
   contradictory Fifth Circuit decision, where the court stated that
23 it was "aware that the term 'construe in accordance with' is
   technically distinguishable from the term 'governed by', but doubts
   that such a fine distinction was intended by the parties."  <u>C.A.</u>
24 <u>May Marine Supply Co. v. Brunswick Corp.</u>, 557 F.2d 1163, 1165 (5th
   Cir. 1977).  These contradictory holdings might be reconciled by
25 the fact that the court was applying the contract law of a
   different state or, perhaps more realistically, that the court has
26 simply adopted a new position in recent history.

1   more than a technical distinction.  It goes to the very heart of
2   the purpose underlying a contract.").  Here, however, those
3   critical words were missing from the choice of law provision.

4        Nevertheless, not all courts have come to the same conclusion
5   as America's Favorite Chicken, Caton, Dollar Systems, Nedlloyd, and
6   Boat Town.  The Sixth Circuit in particular has rejected the view
7   that there is a distinction between "interpreted and construed" on
8   the one hand and "governed by" on the other.  See Boatland, Inc.
9   v. Brunswick Corp., 558 F.2d 818, 821-22 (6th Cir. 1977)
10  (describing distinction between "interpreted and construed" and
11  "governed by" as strained and narrow); Kipin Industries, Inc. v.
12  Van Deilen Int'l, Inc., 182 F.3d 490, 494 (6th Cir. 1999) (citing
13  Boatland with approval).  See also Hammel v. Ziegler Financing
14  Corp., 113 Wis. 2d 73, 76 (1983) (describing distinction as "a
15  trick interpretation or twist on one word").

16       Of course, all of these authorities are merely persuasive,
17  given that the interpretation of the agreement between Access and
18  Lincoln, including the choice of law provision, is a question of
19  Pennsylvania law.  Nevertheless, the court adopts the approach
20  embraced by the majority of courts and concludes that the words
21  employed in the choice of law provision refer only to the
22  construction and interpretation of the agreement, not the
23  substantive law that applies to any dispute arising from the
24  parties' relationship.

25       This is in accord with "the well-settled rule that when
26  interpreting a contract, a court must construe it as it is written,

14

1  giving effect to the clear language and plain meaning of the

2  words." Solomon v. U.S. Healthcare Systems of Pennsylvania, Inc.,

3  797 A.2d 346, 349 (Pa. Super. 2002). Furthermore, Pennsylvania

4  "[c]ourts do not assume that a contract's language was chosen

5  carelessly, nor do they assume that the parties were ignorant of

6  the meaning of the language they employed." Murphy v. Duquesne

7  Univ. of the Holy Ghost, 565 Pa. 571, 591 (2001). This is

8  particularly the case where, as here, the contracting parties are

9  both sophisticated commercial entities.  Finally, adopting the

10 narrow meaning of the phrase "interpreted and construed" increases

11 the number of options available to the contracting parties, because

12 they may choose to apply one state's laws to interpret the contract

13 and another state's laws to govern disputes between them.[5]

14       The question remains as to what law applies in adjudicating

15 Access' motion to dismiss in the absence of an effective choice of

16 law provision.  "[G]enerally speaking the forum will apply its own

17 rule of decision unless a party litigant timely invokes the law of

18 a foreign state [and] . . . demonstrate[s] that the latter rule of

19 decision will further the interest of the foreign state and

20

21 ────────────

22       [5] In C.A. May Marine Supply Co., the Fifth Circuit case in
   tension with more recent decisions, the court discounted this
23 possibility because it could "conceive of few circumstances where
   resort must be had to state law to determine the meaning of
24 ambiguous terms, but not to impose state substantive law upon the
   parties."  557 F.2d at 1165.  Even if there are few circumstances
25 in which the parties may choose to divide the choice of law
   provision across two jurisdictions, the court's ruling preserves
26 the freedom for the parties to enter into such arrangements.

1    therefore that it is an appropriate one for the forum to apply."[6]

2    Washington Mutual Bank, FA v. Superior Court, 24 Cal. 4th 906, 919

3    (2001) (internal quotation marks omitted); see also ABF Capital

4    Corp. v. Grove Props. Co., 126 Cal. App. 4th 204, 215 (2005).

5         Here, however, aside from the fact that plaintiff is a

6    Pennsylvania corporation and that the agreement contains a choice

7    of law provision specifying Pennsylvania law for purposes of

8    contract interpretation, Pennsylvania has little or no interest in

9    the controversy.  California's interest in the controversy is

10   greater than any Pennsylvania might possess; as noted above with

11   regard to the motion to remand, the contract's subject matter

12   pertains to California.  Moreover, plaintiffs' tort claims are

13   governed by California's unique laws.  Furthermore, even if the

14   injury to plaintiff was not specifically felt in California, the

15   claim arose from Access' relationship with California as a licensed

16   claims adjuster.  Accordingly, I conclude California law applies

17   to all the claims at issue, except insofar as they deal with the

18   construction or interpretation of the contract.[7]

19

20        [6] This analysis involves three steps.  Washington Mutual Bank,
     24 Cal. 4th at 919-20.  First, the court must determine whether the
21   proposed foreign rule differs from the forum rule.  Second, if
     there is a difference, the court must determine what interest, if
22   any, each state has in having its own law applied to the case.
     Third, the court must select the law of the state whose interests
23   would be "more impaired" if its law were not applied.

24        [7] Although it might be plausible to apply Georgia law to the
     claims at issue, Access has not requested that the court do so.
25   Accordingly, the only issue before the court is whether it should
     stray from the default application of California law and apply
26   Pennsylvania law.

**2. Claims**

In light of the foregoing, the court need not resolve arguments premised upon Pennsylvania law.[8]  Instead, the remainder of this order addresses arguments premised upon California law.

### a. Negligence & Negligent Misrepresentation

First, Access argues that the economic loss rule bars Lincoln's negligence and negligent misrepresentation claims.  Under California law, purely economic losses due to disappointed expectations do not constitute cognizable injury.[9]  <u>See</u> <u>Robinson Helicopter Co., Inc. v. Dana Corp.</u>, 34 Cal. 4th 979, 988 (2004).  "Quite simply, the economic loss rule 'prevent[s] the law of contract and the law of tort from dissolving one into the other.'"  <u>Id.</u>  If a plaintiff cannot "demonstrate harm above and beyond a broken contractual promise," the economic loss rule bars the claim.  <u>Id.</u>  If, however, there is an independent duty that the defendant has breached, the rule does not bar the claim.   Here, two of Lincoln's claims -- negligence and negligent misrepresentation --

---

[8] For example, Access argues that Lincoln's tort claims are barred by the gist of the action doctrine under Pennsylvania law, <u>Williams v. Hilton Group, PLC</u>, 261 F. Supp. 2d 324, 327-28 (E.D. Pa. 2003), but concedes that the doctrine is not recognized in California.
    Access also argues that Lincoln's claims are barred because it was not legally obligated to settle the Dias claim and that it was therefore acting as a volunteer.  Access then cites Pennsylvania law indicating that where an indemnitee settles an underlying claim without litigation, there is no claim for indemnification.  Again, California law applies, and Access has not shown that a similar rule exists in California.

[9] The economic loss rule also exists in Pennsylvania.  <u>See</u> <u>Werwinski v. Ford Motor Co.</u>, 286 F.3d 661, 671 (3d Cir. 2002) (interpreting Pennsylvania law).

17

1   are barred by the economic loss rule.[10]   The allegations made with

2   regard to the breach of contract claim closely parallel those made

3   with regard to the negligence and negligent misrepresentation

4   claims.    For example, in the breach of contract claim, Lincoln

5   alleges that Access failed to properly investigate liability,

6   prepare reports, handle claims in accordance with established

7   claims procedures, and coordinate litigation activity.[11]   Compl. ¶

8   21.   In the negligence claim, Lincoln alleges that Access failed

9   to respond to Dias' demand letter, notify Lincoln of the Dias

10  claim, and obtain legal counsel to adequately represent Lincoln.

11  Compl. ¶ 33.   In short, the breach of contract claim subsumes the

12  ────────────────

13      [10] Lincoln argues that economic damages should be recoverable
    because it shared a special relationship with Access that imposed
14  a heightened duty of care.   See Ott v. Alfa-Laval Agri, Inc., 31
    Cal. App. 4th 1439, 1448 (1995) (noting that "economic damages,
15  standing alone, can be recovered under some circumstances in an
    action for negligence" where a "special relationship" exists
16  between the plaintiff and defendant").   Here, however, the factors
    for a special relationship are not present: among other things,
17  there is no indication that Access' failure to respond to the time-
    limited demand letter was "intended to affect" Lincoln.   Id. at
18  1455-56 ("The absence of this foundation precludes a finding of
    'special relationship'").
19      To the extent that Lincoln relies upon Access' alleged
    intentional concealment of the mishandling of the Dias claim as a
20  basis for a "special relationship," the fraud/intentional deceit
    claim already alleges a tort, and there is no need for a belt and
21  suspenders approach.   Accordingly, the "special relationship"
    factor aimed at preventing future harm is lacking, because the
22  alleged misconduct is already deterred by existing tort claims.

23      [11] The Claims Service Agreement between the parties provides
    that Access shall, among other things, "[i]nvestigate liability,
24  damages and coverages, evaluate, negotiate claims through
    settlement or final disposition," "[p]repare and file all reports
25  and handle all claims in accordance with established claims
    procedures and state guidelines . . .," and "[c]oordinate, direct
26  and manage litigation activity."   Ex. A to Mot. to Dismiss.

1  negligence and negligent misrepresentation claims.

2      Although Lincoln correctly notes that the economic loss rule

3  is applied most often in the context of products liability cases,

4  it is not confined to this context.  See County of Santa Clara v.

5  Atlantic Richfield, 137 Cal. App. 292, 318 (2006) (economic loss

6  rule applies generally to negligence cases).  Nevertheless,

7  Lincoln's remaining claims, including breach of the covenant of

8  good faith and fair dealing and fraud/intentional deceit, are not

9  barred by the economic loss rule.  See Robinson, 34 Cal. 4th at 989

10 (noting that claims for fraud, deceit, and breach of good faith and

11 fair dealing in contract cases are still cognizable despite the

12 economic loss rule).

13           **b. Fraud and Intentional Deceit**

14              **i. Statute of Limitations**

15     Access argues that California's choice of law with respect to

16 statutes of limitation is governed by a "borrowing statute," which

17 requires adoption of the statute of limitations in the state where

18 the action arose.  Cal. Code Civ. Proc. § 361.  It then asserts,

19 ipse dixit, that the alleged fraud arose in Pennsylvania and would

20 therefore be subject to Pennsylvania's two-year statute of

21 limitation.[12]    42 Pa. C.S. § 5524(7) (two-year statute of

22

23      [12] In its reply, Access introduces the new argument (not
   briefed in its motion) that the fraud arose in Pennsylvania
   because, pursuant to the parties agreement, Access' reports were
24 to be submitted to a computer in Lincoln's home office.  Even if
   true, however, this would not negate the possibility that part of
25 the fraud also arose in California.  Just as venue may be
   appropriate in more than one district, Rodriquez v. California
26 Highway Patrol, 89 F. Supp. 2d 1131, 1136 (N.D. Cal. 2000), so too

1  limitation for fraud).

2      Lincoln purported to discover the Dias claim and Access'

3  alleged fraud "on or about January 28, 2005." Compl. ¶ 14.

4  Lincoln then filed its complaint approximately two years and two

5  months later.  Given that Access allegedly concealed information

6  concerning a California claim, at least part of the fraud could be

7  said to arise out of California.[13]  Because California's statute of

8  limitations regarding fraud claims is three years, Cal. Code Civ.

9  Proc. § 338, the court finds that the complaint was timely filed.

10              **ii. Pleading with Particularity**

11      Access next argues that the fraud claim has not been alleged

12  with  particularity  because  Lincoln  has  not  identified  the

13  individual or individuals who made fraudulent statements.  Because

14  of the nature of the fraud alleged in this case, however, in which

15  the alleged misconduct stemmed from Access' purposeful silence, it

16  would  be  illogical  to  demand  that  Lincoln  identify  the  specific

17  individuals who perpetrated the fraud.

18              **c. Breach of Contract**

19      Finally, Access maintains that the breach of contract claim

20  ought to be dismissed because Lincoln was insured with respect to

21  the Dias claim.  Under California law, the collateral source rule,

22  _____

23  might a cause of action arise in more than one forum.

24      [13] Arguably, the fraud might have also partially arisen out of
    Georgia,  the  place  where  Access  administered  its  claims.   Again,
25  however,  no  party  has  requested  application  of  Georgia  law  and  the
    burden  of  applying  a  foreign  jurisdiction's  law  rests  with  the
26  party who requests it.  <u>Washington Mutual Bank</u>, 24 Cal. 4th at 919.

1   which normally permits suits against wrongdoers even where the

2   plaintiff has obtained payment through an independent source, does

3   not apply to contract claims.[14]   See Plut v. Fireman's Fund Ins.

4   Co., 85 Cal. App. 4th 98, 107-09 (2001) ("The overwhelming weight

5   of authority in California and other jurisdictions has rejected the

6   extension of the collateral source rule to breach of contract.");

7   Bramalea California, Inc. v. Reliable Interiors, Inc., 119 Cal.

8   App. 4th 468, 472 (2004) ("The collateral source rule, if applied

9   to an action based on breach of contract, would violate the

10  contractual damage rule that no one shall profit more from the

11  breach of an obligation than from its full performance.") (internal

12  quotation marks omitted).

13      Here, Access has tendered Lincoln's Corporate Disclosure

14  Statement and Statement of Financial Interest, filed in a different

15  but related action between Lincoln and Access.[15]   In the statement,

16  Lincoln states that Chubb Reinsurance, Inc. has an interest in the

17  related action because of "their subrogation rights in connection

18  with an insurance claim made on behalf of Chubb's re-insured,

19  _____

20      [14] As noted above, the choice of law provision applying
    Pennsylvania law is only relevant to the extent that the court
21  "interprets" or "construes" the parties' agreement.   In this
    section, the court is not interpreting or construing the parties'
22  agreement.   Although the scope of the collateral source rule may
    be relevant to the issue of damages for an alleged breach of
23  contract, the court is not applying contract law for the purposes
    of contract interpretation or construction.   Accordingly,
24  California law governs.

25      [15] Access maintains that the court may take judicial notice of
    public records related to legal proceedings.   Robinson Racheria
26  Citizens Council v. Borneo, Inc., 971 F.2d 244, 248 (9th Cir.
    1992).

1   Lincoln General."  Ex. 3.  The document does not state, however,

2   that Lincoln General was reimbursed in full for the settlement.

3       Accordingly, while the court might dismiss the breach of

4   contract claim given that the benefit of the California collateral

5   source rule does not extend to contract claims, there are

6   nevertheless potential factual issues that might require discovery.

7   In an abundance of caution, the court declines to grant the motion

8   to dismiss with respect to the breach of contract claim.

9                          **IV. Conclusion**

10      For the reasons set forth above, the court DENIES the motion

11   to transfer.  The court GRANTS the motion to dismiss with respect

12   to the negligence and negligent misrepresentation claims and DENIES

13   the motion to dismiss with respect to the breach of contract,

14   breach of good faith and fair dealing, and fraud claims.

15      IT IS SO ORDERED.

16      DATED:  August 29, 2007.

17

18

19                              LAWRENCE K. KARLTON
                                SENIOR JUDGE
20                              UNITED STATES DISTRICT COURT

21

22

23

24

25

26