Lewis E. Hassett, Esq.
Jessica F. Pardi, Esq.
**MORRIS, MANNING & MARTIN, LLP**
1600 Atlanta Financial Center
3343 Peachtree Road
Atlanta, Georgia 30326
Telephone: (404) 233-7000
Facsimile: (404) 365-9532

Robert E. Davies, Esq., SBN 106810
**CAULFIELD, DAVIES & DONAHUE LLP**
P.O. Box 277010
Sacramento, CA 95827-7010
Telephone: (916) 817-2900
Facsimile: (916) 817-2644

Mona Z. Hanna, Esq., SBN 131439
**MICHELMAN & ROBINSON, LLP**
4 Hutton Centre Drive, Suite 300
Santa Ana, California 92707
Telephone: (714) 557-7990
Facsimile: (714) 557-7991

**Attorneys for Defendant:**
**ACCESS CLAIMS ADMINISTRATORS, INC.**

## UNITED STATES DISTRICT COURT
## EASTERN DISTRICT OF CALIFORNIA
### SACRAMENTO DIVISION

| | |
|---|---|
| LINCOLN GENERAL INSURANCE COMPANY, | ) Case No. 2:07-cv-01015-LKK-EFB |
| | ) |
| Plaintiff, | ) **DEFENDANT'S REPLY BRIEF IN** |
| | ) **SUPPORT OF MOTION FOR SUMMARY** |
| v. | ) **JUDGMENT** |
| | ) |
| ACCESS CLAIMS ADMINISTRATORS, INC., and DOES 1 through 75, inclusive, et al., | ) |
| | ) Hearing Date:    1/12/2009 |
| | ) Hearing Time:    10:00 a.m. |
| | ) Hearing Judge:  Hon. Lawrence Karlton |
| | ) Hearing Dept.:  Courtroom 4 |
| Defendants. | ) Complaint Filed: April 9, 2007 |
| | ) Trial Date:      June 16, 2009 |

# TABLE OF CONTENTS

I. INTRODUCTION .................................................. 1

II. ARGUMENT AND ANALYSIS ....................................... 1

   A.   Access Claims Did Not Breach the Claims
       Agreement. ................................................ 1

       1.   Access Claims Did Not Receive the Time-
            Limited Demand. ...................................... 1

       2.   Access Claims Had Not Determined Coleman
            was Liable for the Accident. ......................... 6

       3.   Access Claims Did Not Cause Lincoln's
            Alleged Damages. ..................................... 7

   B.   Access Claims Did Not Breach the Covenant of
       Good Faith and Fair Dealing. ............................. 8

   C.   There is No Evidence of Fraudulent
       Concealment of Any Information Pertaining to
       the Dias Claim. ......................................... 10

   D.   Any Breach of Duty by Access Claims Did Not
       Cause Lincoln's Alleged Damages. ........................ 13

       1.   Pennsylvania Law Applies to the Claims
            Agreement. ........................................... 13

       2.   Under Pennsylvania Law, Lincoln Must
            Prove Actual Liability. .............................. 14

       3.   California Law Requires Lincoln to Show
            Actual Liability. ................................... 15

       4.   Lincoln was Not Actually Liable as a
            Matter of Law Because an Excess Judgment
            had not been Rendered Against Coleman. ........ 16

       5.   Lincoln Was Not Actually Liable to the
            Diases on the Facts. ................................ 18

   E.   Lincoln Settled the Dias Claim as a Volunteer
       and is Not Entitled to Indemnification by
       Access Claims. .......................................... 19

   F.   Lincoln Has Been Reimbursed for All Damages. ....... 19

       1.   Lincoln was reimbursed under the LPTA
            for the Settlement. ................................. 19

1          2.     It is too late for Lincoln to claim it
                    sues for the reinsurers, and any rights
2                     of subrogation must be asserted by the
                    particular reinsurer, not by Lincoln. ......... 22
3
         3.     Lincoln Cannot Recover the Costs of
4                     Defending Coleman. ......................... 24

5 III. CONCLUSION ............................................... 25

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Defendant's Reply Brief In Support of Motion for Summary Judgment**

1

**TABLE OF AUTHORITIES**

2

3

## Cases

4 *Agosta v. Astor*, 120 Cal.App.4th 596, 15
    Cal.Rptr.3d 565 (2004) ............................. 13

5 *Air Prod. and Chem., Inc. v. Eaton Metal Prod. Co.*,
6    256 F.Supp.2d 329 (E.D. Pa. 2003) ................. 12

7 *Allen v. Allstate Ins. Co.*, 656 F.2d 487 (9th Cir.
8    1981) ............................................ 1, 7

9 *Back v. Allstate Ins. Co.*, No. Civ. 5045 LKK/CMK,
     2005 WL 1683885 (E.D. Cal. July 13, 2005) ........... 7
10
   *Badie v. Bank of America*, 67 Cal.App.4th 779, 79
11    Cal.Rptr.2d 273 (1998) ............................ 10

12 *Beachwoods Flying Svc. Inc. v. Al Hamilton
13    Contracting Co.*, 476 A.2d 350 (Pa. 1984) ........... 24

14 *Bergene v. Salt River Agr. Impr. & Power Dist.*, 272
     F.3d 1136 (9th Cir. 2001) ........................... 6
15
   *Betts v. Allstate*, 154 Cal.App.3d 688, 201
16    Cal.Rptr. 528 (1984). ............................... 8

17 *Blatz v. City of Rock Falls*, 434 N.E.2d 807 (Ill.
18    App. 1982) ........................................ 23

19 *Boecken v. Gallo Glass Co.*, No. 1:05-cv-00090-OWW-
20    DLB, 2008 WL 4470867 (E.D. Cal. 2008) .............. 22

21 *Boyd v. City of Oakland*, 458 F.Supp.2d 1015 (N.D.
     Cal. 2006) ........................................ 22
22
   *Carma Developers, Inc. v. Marathon Development
23    California, Inc.*, 2 Cal.4th 342, 6 Cal.Rptr.2d
24    467, 826 P.2d 710 (1992) ........................ 9, 10

25 *Carolina Power & Light v. Uranex*, 451 F.Supp. 1044
     (N.D. Cal. 1977) .................................. 22
26
   *Century Resid., LLC v. County of Santa Clara*, No.
27    H031985, 2008 WL 4750798 (Cal. Ct. App. Oct.
28    30, 2008) ......................................... 20

Defendant's Reply Brief In Support of Motion for Summary Judgment

1  *Comunale v. Traders & Gen. Ins. Co.*, 50 Cal.2d 654,
2       328 P.2d 198 (1958) .................................. 1

3  *Crisci v. Sec. Ins. Co.*, 66 Cal.2d 425, 58
        Cal.Rptr. 13, 426 P.2d 173 (1967) .................... 1
4
   *Frantz Tractor Co. v. Providence Wash. Ins. Co.*,
5       119 A.2d 495 (Pa. 1956) ............................. 24

6  *Glacier Gen. Assur. Co. v. G. Gordon Symons Co.*,
7       631 F.2d 131 (9th Cir. 1980) ................... 23, 24

8  *Hamilton v. Maryland Cas. Co.*, 27 Cal.4th 718, 117
        Cal.Rptr.2d 318, 41 P.3d 128 (2002) ............ 16, 17
9
   *Hougue v. City of Holtville*, No. 07cv2229 WQH
10      (WMc), 2008 WL 1925249 (S.D. Cal. Apr. 30,
11      2008) ............................................... 9

12 *In re Glacier Ins. Co.*, 234 Cal.App.3d 1549, 286
        Cal.Rptr. 262 (1991) ............................... 20
13
   *K.C. ex rel. Rick v. Upland Unified School Dist.*,
14      No. EDCV 06-1314-VAP (JCRx), 2008 WL 4553212
15      (C.D.Cal. Oct. 27, 2008) ............................ 3

16 *Lazar v. Hertz Corp.*, 143 Cal.App.3d 128, 191
        Cal.Rptr. 849 (1983) ............................... 10
17
   *Leslie G. v. Perry & Assocs.*, 43 Cal.App.4th 472,
18      50 Cal.Rptr.2d 785 (1996) ........................... 4
19
   *Malibu Broadbeach L.P. v. State Farm Gen. Ins. Co.*,
20      No. B195286, 2008 WL 588998 (Cal. Ct. App.
21      March 5, 2008) ..................................... 24

22 *Martinique Shoes, Inc. v. N.Y. Progressive Wood
        Heel Co.*, 217 A.2d 781 (Pa. Super. 1966) ........... 14
23
   *Mirkin v. Wasserman*, 5 Cal. 4th 1082, 23
24      Cal.Rptr.2d 101, 858 P.2d 568 (1993) ............... 13

25 *Murphy v. Allstate Ins. Co.*, 17 Cal.3d 937, 132
26      Cal.Rptr. 424, 553 P.2d 584 (1976) ................. 18

27 *Nava v. Virtualbank*, No. 2:08-CV-00069-FCD-KJM,
28      2008 WL 2873406 (E.D. Cal. July 16, 2008) ........... 9

1  *Orr v. Bank of Amer.*, 285 F.3d 764 (9th Cir. 2002) ....... 21

2  *Ortega v. Kmart Corp.*, 26 Cal.4th 1200, 114
3     Cal.Rptr.2d 470, 36 P.3d 11 (2001) ................. 18

4  *People v. Quong Sing*, 20 Cal.App. 26, 127 P. 1052
      (1912) ............................................... 4
5
   *Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999 (9th
6     Cir. 2002) ......................................... 22

7  *Philadelphia Elec. Co. v. Hercules, Inc.*, 762 F.2d
8     303 (3d Cir. 1968) ................................. 14

9  *PPG Indus., Inc. v. Central Indus. Maint., Inc.*, No
      05CV1193, 2006 WL 752982 (W.D. Pa. Mar. 22,
10     2006) .............................................. 14

11
   *PPG Indus., Inc. v. Transamerica Ins. Co.*, 20
12    Cal.4th 310, 84 Cal.Rptr.2d 455, 975 P.2d 652
      (1999) ............................................... 2
13
14 *R. J. Kuhl Corp. v. Sullivan*, 13 Cal.App.4th 1589,
      17 Cal.Rptr.2d 425 (1999) ........................... 9
15
   *Safeco Ins. Co. v. Superior Court*, 71 Cal.App.4th
16    782, 84 Cal.Rptr.2d 43 (1999) ...................... 17

17 *School Dist. No. 1J v. ACandS, Inc.*, 5 F.3d 1255
18    (9th Cir. 1993) .................................... 22

19 *State Sec. Ins. Co. v. Frank B. Hall & Corp*, 109
      F.R.D. 99 (N.D. Ill. 1986) ......................... 23
20
   *Trigueros v. Southwest Airlines,* Case No. 05-cv-
21    2256-L(AJB), 2007 WL 2502151 (S.D. Cal. Aug.
22    30, 2007) ......................................... 4, 5

23 *United States v. Bennett*, 363 F.3d 947 (9th Cir.
      2004) .............................................. 21
24
   *Werwinsky v. Ford Motor Co.*, 286 F.3d 661 (3d Cir.
25    2002) .............................................. 12

26
   *William Int'l. Corp. v. New Era Decorative Fabrics,*
27    *Inc.*, No. B187650, 2007 WL 1866769 (Cal. Ct.
      App. June 29, 2007) ................................ 12
28

1  **Statutes**

2  California Civil Code § 2778(3) .......................... 25

3  California Insurance Code § 11580(b)(2) .................. 17

4  California Insurance Code § 769.83(g)(2) ............. 11, 12

5  Federal Rule of Civil Procedure 56(e) ................... 21

6  Federal Rule of Civil Procedure 56(e)(1) ................ 21

7  Federal Rules of Evidence 1002 and 1004 ................. 21

8

9  Federal Rules of Evidence 302 ............................ 4

10  Federal Rules of Evidence 401 ............................ 4

11  Pennsylvania Rules of Civil Procedure 2002(d) ........... 24

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

**Defendant's Reply Brief In Support of Motion for Summary Judgment**

1

## I.   INTRODUCTION

2   Access Claims Administrators, Inc. ("Access Claims") is

3   entitled to summary judgment for the following reasons:

A.   Access Claims did not breach the Claims Agreement;

4

B.   Access Claims did not breach any covenant of good faith and

5   fair dealing;

6   C.   Access Claims did not fraudulently conceal information

7   regarding the Dias Claim;

8   D.   Any breach of duty by Access Claims did not cause Lincoln's

9   alleged damages;

E.   Lincoln's payment of $3.8 million to settle the Dias Claim

10   was a voluntary payment; and

11   F.   Lincoln has been reimbursed for all damages.

12   Lincoln's Response to Access Claims' Motion for Summary

13   Judgment (the "Response") fails to raise disputed material facts

14   or to defeat Access Claims' legal arguments.

## II.   ARGUMENT AND ANALYSIS

15

### A.   Access Claims Did Not Breach the Claims Agreement.

16

#### 1.   Access Claims Did Not Receive the Time-Limited Demand.

17

18   In Access Claims' Brief in Support of Motion for Summary

19   Judgment ("Access Claims' Initial Brief"), p. 10, Access Claims
argued that, because Access Claims did not receive the time-

20   limited demand (the "TLD"), it did not breach the Claims

21   Agreement.  Lincoln does not dispute that statement of law and,

22   in fact, cites cases consistent with that proposition.  *Comunale*

23   *v. Traders & Gen. Ins. Co.*, 50 Cal.2d 654, 657, 328 P.2d 198

24   (1958) (insurer refused to defend and knowingly and intentionally
refused to settle); *Allen v. Allstate Ins. Co.*, 656 F.2d 487, 488

25   (9th Cir. 1981) (knowing and intentional refusal to settle);

26   *Crisci v. Sec. Ins. Co.*, 66 Cal.2d 425, 428-29, 58 Cal.Rptr. 13,

27   426 P.2d 173 (1967) (same); *PPG Indus., Inc. v. Transamerica Ins.*

28   *Co.*, 20 Cal.4th 310, 314-15, 84 Cal.Rptr.2d 455, 975 P.2d 652

1 (1999) (same).

2 Lincoln cites to six items of alleged circumstantial
3 evidence that Access Claims received the TLD prior to its stated
expiration date on January 30, 2004 (the "Expiration").
4 Lincoln's "evidence" is either inadmissible or does not support
5 the conclusions and inferences Lincoln advocates.

6 First, Lincoln relies upon the unauthenticated and
7 unexplained facsimile header on the TLD and facsimile reports
8 attached to subsequent, related correspondence first marked by
9 Lincoln as Exhibits 137A, 138A, and 139 at Gary Dolinski's
deposition.[1]  However, even if admitted, Dolinski's testimony does
10 not establish that the TLD or subsequent related letters were
11 properly sent to or received by Access Claims:

12     Q.  To your knowledge, was [Exhibit 138A] actually
           sent by fax to Mr. Eggers?
13
       A.  Again, the problem I have with the question is
14         that I don't fax letters.

15 (Dolinski Depo., p. 29).

16     A.  . . . I wish I had more personal knowledge of how
           our fax transmissions work.... Like I said, I
17         don't fax.  I don't pay attention to transmission
           reports and all of the stuff on them.

18 (*Id*. at pp. 57-58).

19     A.  Oh, boy I have to think about what our
           confirmation report looks like when it prints out.
20         And I don't believe that our confirmation report
           would have that fax header on the top. . . .  What
21         I'm saying to you is it is possible that our send
           confirmation reports don't have that fax header
22         when we print them out in our office.  That's a
           possibility. . . .  I can tell you that [the TLD]
23         was communicated. And that's probably as far as I
24

25 [1] Access Claims objects to the use of Exhibits 137A, 138A, and 139
   for the purpose of establishing that the TLD or any related
26 correspondence was properly faxed to and/or received by Access
   Claims.  Access Claims' complete objection is contained in
27 Objection to Evidence Submitted by Plaintiff in Opposition to
28 Defendant's Motion for Summary Judgment and incorporated herein
   by reference.

2

**Defendant's Reply Brief In Support of Motion for Summary Judgment**

1        can go. . . .

2   A.   So is your testimony that you believe that the fax
         line at the top of each page is not printed by
3        your office?

4   A.   I don't believe so.

    Q.   Do you have any knowledge of where that line comes
5        from?

6   A.   I don't understand the question.

7   Q.   Do you know what machine or office would print
         that line?

8   A.   No.  I wish I had more personal knowledge of how
         our fax transmissions work. . . .
9
    Q.   Also do you know whether that fax string would
10       have printed at your office in 2004?

11  A.   No, I don't recall.

12  (Dolinski Depo., pp. 54-58).

13       Essentially, Lincoln asks the Court to take judicial notice

    that Dolinski's office's fax line is sufficient to evidence
14
    transmission and receipt.  But the quality and accuracy of
15  Dolinski's fax machine and the interpretation of facsimile

16  headers is not properly a matter for judicial notice.  *See K.C.*

17  *ex rel. Rick v. Upland Unified School Dist.*, No. EDCV 06-1314-VAP

18  (JCRx), 2008 WL 4553212, at *2 (C.D.Cal. Oct. 27, 2008)

    (facsimile cover sheet and/or transmission confirmation page not
19
    appropriate for judicial notice).

20       Lincoln's second, third, and sixth pieces of purported

21  evidence involve the presence of the TLD in Access Claims' file

22  (the "File") months after the Expiration.  Lincoln cites to the

23  following testimony:  Tim Kirk said he saw the TLD in the File **as

    of January of 2005**; Sally Walsh said she believes she saw the TLD
24
    in the File **sometime before Lincoln settled the Dias Claim in
25  March of 2005**; and counsel for Lincoln declared he received the

26  TLD in the documents Access Claims produced **in January of 2008**.

27  (Response, pp. 13 and 14).

28

                                    3

1    Not only are these statements wholly irrelevant to whether
2  Access Claims received the TLD at anytime prior to the
3  Expiration, they also fail to contradict Mr. Eggers unequivocal
4  testimony that the TLD was not received by Access Claims prior to
   the Expiration. *Trigueros v. Southwest Airlines,* Case No. 05-cv-
5  2256-L(AJB), 2007 WL 2502151, at *6 (S.D. Cal. Aug. 30, 2007)
6  ("[W]hen the plaintiff relies on circumstantial evidence, that
7  evidence must be specific and substantial to defeat defendant's
8  motion for summary judgment."); *see also* Fed.R.Evid. 302 (state
9  law presumptions apply in diversity cases); *Leslie G. v. Perry &
   Assocs.,* 43 Cal.App.4th 472, 483, 50 Cal.Rptr.2d 785 (1996) ("We
10 will not, however, draw inferences from thin air. Where, as
11 here, the plaintiff seeks to prove an essential element of her
12 case by circumstantial evidence, she cannot recover merely by
13 showing that the inferences she draws from those circumstances
14 are *consistent* with her theory. Instead, she must show that the
15 inferences favorable to her are *more reasonable or probable* than
   those against her."). Indeed, given that the Diases claim the
16 Policy limits were opened, it is only logical that the TLD would
17 be sent to and appear in the File in the months after it
18 allegedly expired. *See People v. Quong Sing*, 20 Cal.App. 26, 34,
19 127 P. 1052 (1912) ("[A] thing once proved to exist continues as
20 long as usual with things of that nature [citation omitted]; but
   this maxim does not work backwards. The evidence ... was not
21 sufficient to support the finding [as to prior existence of
22 facts].").

23   Fourth, Lincoln argues that Eggers' February 10, 2004,
24 correspondence (the "February 10 Letter") to Dolinski, mentioning
25 documents and faxes received from Dolinski's office, is a
26 reference to the TLD. Lincoln's leap is unsupported. Nothing in
   the February 10 Letter makes it more likely that Eggers was
27 referring to the TLD, as opposed to any other document or fax.
28 *See* Fed.R.Evid. 401 (circumstantial evidence probative only if

4

**Defendant's Reply Brief In Support of Motion for Summary Judgment**

1   one inference is more likely than another); *see also Trigueros*,

2   2007 WL 2502151, at *6.   In any event, Eggers testified

3   unequivocally that the documents and faxes mentioned in the

    February 10 Letter did *not* include the TLD:

4
        Q.   So if you're saying - - obviously you can't
5            respond to letters that you never saw; correct?

6       A.   No.   **It's obviously not a response to the [TLD]**
             because it doesn't say anything about the demand
7            in the letter.

8       Q.   And you're saying that you don't remember seeing
             these letters before February 10th, 2004, right?

9       A.   Well, I don't remember seeing them, but more
             specifically is that **it would have your demand for**
10           **policy limits or whatever had I been referring to**
             **those letter or even seen those letters.**
11

12  (Eggers Depo., p. 98)(emphasis added).

        Even if the equivocal, circumstantial evidence cited by
13
    Lincoln could be twisted to support Lincoln's position, any
14  unlikely or unreasonable inference must yield to the direct

15  evidence from Eggers' testimony.

16      Next, Lincoln claims an inference of receipt can be drawn

17  from Eggers' alleged failure to inform the Diases' counsel he had

    not received the TLD.   (Response, pp. 13 and 14).   This too is an
18
    unreasonable inference as Eggers testified he did ask the Diases'
19  counsel about the TLD they allegedly sent:

20      Q.   So is there any reason . . . why you didn't tell
             [the Diases' counsel] in a letter, "We never got
21           this policy limit demand that you were talking
             about"?
22

23      MS. PARDI:   Object to form.

        A.   **I did.   I am asking for the demand packages right**
24           **here.**   It's - - I mean, maybe it's a different way
             of phrasing it, **but it's pretty clear that I had**
25           **never received the demand packages if I'm asking**
             **for a demand from an attorney in July.**
26
    BY MR. WORTHINGTON:
27
        Q.   But your letter doesn't state specifically that
28           you didn't receive any demand earlier; correct?

                              5

1   A.   It's saying in there - - asking for the status of
         the demand packages.
2
    Q.   Right.
3
    A.   Taking this one step further, why would you ask
4        for demand packages if you had already received
         them?
5   (Eggers Depo., pp. 107-08)(emphasis added).

6        Lincoln cites *Bergene v. Salt River Agr. Impr. & Power
7   Dist.*, 272 F.3d 1136, 1142 (9th Cir. 2001), for the proposition
8   that a genuine dispute of fact can be shown from inferences
    arising from direct evidence.  But Lincoln has submitted no
9   direct evidence.  (Response, p. 10).  The *Bergene* plaintiff
10  provided sufficient direct evidence of her discrimination claim
11  to avoid summary judgment by her employer. *Bergene*, 272 F.3d at
12  1142. Furthermore, the circumstantial evidence considered by the
13  *Bergene* court dealt with the employer's *motive* for firing
14  Bergene, an allegation rarely established by direct evidence.
15  *Id.* at 1142-44.  Accordingly, Lincoln's reliance upon inferences
    is inappropriate, especially where the facts Lincoln attempt to
16  prove are subject to direct evidence, i.e., whether Access Claims
17  received the TLD, and the inferences Lincoln suggests are no more
18  likely than contrary inferences.

19            **2.  Access Claims Had Not Determined Coleman was
                   Liable for the Accident.**

20       Based upon an ambiguous entry in the electronic claim notes,
21  Lincoln erroneously argues Eggers "had already concluded that
22  Coleman was '100% liable' for the accident, and yet took no good-
23  faith efforts to effectuate a prompt settlement by responding to
    [the TLD]."  (Response, pp. 12-13).  Lincoln ignores Eggers'
24  undisputed testimony regarding this entry.  When asked about the
25  "100% liable" notation, Eggers testified as follows:

26  Q.   Here are you simply saying what another document
         said or are you making an evaluation of what you
27       believed what was the circumstance in the case
         based upon all of the information you had?
28

                              6

1    A.    I can't tell you because it doesn't say that.
2  (Eggers Depo., p. 72).

3       Accordingly, there is no evidence Eggers concluded Coleman
4  was "100% liable" for the Accident.  Indeed, Eggers' November 24,
   2003, entry confirms he was aware of alternate theories of
5  liability for the Diases' alleged damages:    "VHCL  is  BEING
6  INVESTIGATED FOR PRODUCT LIABILITY BY CLIENT ATTORNEY."   (Exh. 3,
7  p. 12 of 25, 11/24/03 entry).

8       Lincoln has no basis for its argument that Access Claims had
   an obligation to settle the Dias Claim based upon the clear
9  liability of Lincoln's insured.

10      In any event, Lincoln's liability over Policy limits was
11 conditioned upon Access Claims' timely receipt of the TLD.   See
12 Back v. Allstate Ins. Co., No. Civ. 5045 LKK/CMK, 2005 WL
13 1683885, at *8 (E.D. Cal. July 13, 2005) (Karlton, J.).
14 Otherwise, Diana Dias could have been offered Policy limits
   later.
15
        For similar reasons, Lincoln's argument that Access Claims
16 had a contractual duty to respond to the TLD within 15 days also
17 fails.    (Response, p. 12).  Any such failure did not trigger
18 liability.   The ten-day limit of the TLD already would have
19 expired.   Any argument that Lincoln could have settled for less
20 in such circumstance begs for speculation.

21             3.    **Access Claims Did Not Cause Lincoln's Alleged
                     Damages.**

22      Lincoln attempts to bootstrap a damages argument onto its
23 allegations of breach of the Claims Agreement and/or the
   Covenant.   (Response, pp. 14-17).  This argument again assumes,
24 without support, that Access Claims received the TLD and relies
25 upon Allen (previously distinguished on page 1) and Betts v.
26 Allstate Ins. Co.  As with Lincoln's other cases, Betts involved
27 an insurer's intentional and repeated refusal to settle a claim
28 followed by an excess judgment obtained by the claimant.   Betts,

                                  7
**Defendant's Reply Brief In Support of Motion for Summary Judgment**

154 Cal.App.3d 688, 696-98, 201 Cal.Rptr. 528 (1984). Lincoln cites *Betts* for the proposition that an insurer that **rejects** a settlement offer without seeking clarification of any uncertain terms contained within such offer does so at its own peril. (Response, p. 15). This proposition is, of course, inapplicable to a demand that is not received.

Even assuming receipt of the TLD, the TLD did not set forth a reasonable demand. Lincoln argues that, if the TLD was ambiguous, Access Claims should have sought clarification. (Response, p. 15). But the TLD was not materially ambiguous, and clarification was not necessary. As Lincoln itself suggests, the Diases were making a single, joint demand of $15,000 each. (*Id.*). Because David Dias' claim was not worth $15,000, any rejection of the TLD would have been reasonable. Even Lincoln's own expert testified that David Dias' claim was worth no more than $1,500. (Quinn Depo., p. 132).

Next, Lincoln argues that if Access Claims had informed the Diases' counsel of the additional claimants (i.e. the Coleman daughters), the Diases could have lowered the amount of the demand. (Response, pp. 16-17). This speculation is unpersuasive. No evidence suggests that the Diases would have lowered their demand to accommodate other claims. Further, Access Claims has no obligation to provide information regarding claims made by other claimants and, indeed, would be prohibited from providing any medical information.

Access Claims did not breach the Claims Agreement or cause any of Lincoln's alleged damages.

### B. Access Claims Did Not Breach the Covenant of Good Faith and Fair Dealing.

Lincoln does not raise any disputed facts or legal arguments sufficient to defeat Access Claims' motion with respect to breach of the Covenant. The cases cited by Lincoln are wholly inapplicable to the instant dispute. Lincoln's cases pertain to

**Defendant's Reply Brief In Support of Motion for Summary Judgment**

1  proof of *motive* which, accepting *arguendo* Lincoln's contention,
2  does not have to be proven to establish a breach of the Covenant.
3  California law, however, requires proof of "a conscious and
4  deliberate act," which undisputedly did not occur in this matter.
   *Hougue v. City of Holtville*, No. 07cv2229 WQH (WMc), 2008 WL
5  1925249, at *4 (S.D. Cal. Apr. 30, 2008); *Nava v. Virtualbank*,
6  No. 2:08-CV-00069-FCD-KJM, 2008 WL 2873406, at *10 (E.D. Cal.
7  July 16, 2008); Kirk Depo., vol. 2, p. 148; Bergmann Depo., pp.
8  137-38; Burke Depo., pp. 156-57; Carter Depo., p. 177. Each of
9  Lincoln's cases contains an intentional act by the defendant and,
   therefore, actually support Access Claims' argument that in the
10 absence of an intentional act, a party cannot breach the
11 Covenant.

12     The first case cited by Lincoln, *R.J. Kuhl Corp. v.*
13 *Sullivan*, involves a contract between a real estate broker and a
14 purchaser and the *intentional* refusal to perform under the
   contract by the purchaser. The purchaser's *intentional refusal*
15 was motivated by and resulted in the purchaser gaining an unfair
16 economic advantage. *Kuhl*, 13 Cal.App.4th 1589, 1593, 17
17 Cal.Rptr.2d 425 (1999). The purchaser *intended* to avoid the
18 broker's commission through a side real estate transaction. *Id.*
19 at 1596-97. The *Kuhl* language cited by Lincoln regarding "lack
20 of diligence and slacking off" as sufficient to establish a
21 breach of the Covenant is merely *dicta* within the case.
   (Response, p. 19 (*citing Id.* at 1602)). Furthermore, there is no
22 indication as to whether such slacking off must be intentional to
23 constitute a breach.

24     Next, Lincoln cites *Carma Developers, Inc. v. Marathon*
25 *Development California, Inc.*, 2 Cal.4th 342, 6 Cal.Rptr.2d 467,
26 826 P.2d 710 (1992), a tenant's lawsuit against its landlord
   alleging wrongful termination of a commercial lease pursuant to a
27 recapture clause. The termination was an *intentional* act, and
28 the language cited by Lincoln regarding the irrelevant nature of

1 the actor's motive is mere *dicta*. Notably, the *Carma* court found
2 no violation of the Covenant and went on to hold that "implied
3 terms should never be read to vary express terms." Accordingly,
4 Lincoln cannot argue implied duties vary the express obligations
5 of the Claims Agreement (e.g. Access Claims' limited duties of
disclosure of claims information).

6 Next, Lincoln cites *Lazar v. Hertz Corp.*, 143 Cal.App.3d
7 128, 191 Cal.Rptr. 849 (1983), wherein a rental car customer
8 filed suit challenging the rental company's *intentional* charges
9 for gasoline upon return of an automobile. The Covenant is not
even at issue in *Lazar*. The *Lazar* case did state that an open
10 term in a contract must be filled within the standard of good
11 faith and fair dealing, but there are no such open terms in
12 dispute in the instant litigation. *Lazar* is inapplicable.

13 *Badie v. Bank of America*, 67 Cal.App.4th 779, 79 Cal.Rptr.2d
14 273 (1998), as cited by Lincoln, is equally inapposite. In
15 *Badie*, Bank of America *intentionally* added an arbitration clause
16 to a contract. The court stated that such addition was an
"attempt to recapture foregone opportunity." *Id.* at 796. Thus,
17 while the bank's motive may not have been relevant, there was an
18 *intentional act* which constituted breach of the Covenant.

19 All of the cases cited by Lincoln involve an intentional act
20 constituting a breach of the Covenant. Lincoln has admitted
21 there was no such intentional act committed by Access Claims and
therefore, that Access Claims is entitled to summary judgment.

22       **C.    There is No Evidence of Fraudulent Concealment of**
23              **Any Information Pertaining to the Dias Claim.**

24 A review of Access Claims' Initial Brief and of Lincoln's
Response reveals that Lincoln's fraud claim fails for at least
25 six reasons. First, Access Claims did not receive the TLD prior
26 to the Expiration and did not handle such demand or the Dias
27 Claim in bad faith. This issue has been discussed previously.
28 Accordingly, Access Claims had no information regarding bad faith

10
**Defendant's Reply Brief In Support of Motion for Summary Judgment**

1 handling to disclose to Lincoln.

2     Second, in its Initial Brief, p. 18, Access Claims noted
3 that it was contractually forbidden to set a reserve higher than
4 the Policy limits.  Lincoln apparently agrees since it has not
responded to this point.

5     Third, not only was Access Claims forbidden from setting a
6 reserve over Policy limits, it had no contractual duty
7 affirmatively to report to Lincoln allegations of bad faith.
8 (Access Claims' Initial Brief, pp. 18-19).  In response, Lincoln
9 argues Access Claims was required to disclose information
regarding the Dias Claim pursuant to California Insurance Code
10 § 769.83(g)(2), which is referenced in the Claims Agreement.
11 (Response, p. 24).  Such section refers to the obligations of a
12 managing general agent and states:

13         A copy of the claim file shall be sent to the
        insurer **at its request or** as soon as it becomes
14         known that the claim is subject to any of the
        following:
15
        A.   Has the potential to exceed an amount
16             determined by the commissioner or exceeds the
            limits set by the company, whichever is less.
17
        B.   Involves a coverage dispute.
18
        C.   May exceed the MGA's claims settlement
19             authority.

20         D.   Is open for more than six months.

        E.   Is closed by payment of an amount set by the
21             commissioner or an amount set by the insurer,
            whichever is less.
22
Cal. Ins. Code § 769.83(g)(2) (emphasis added).

23     As explained by Tim Kirk, the Vice President of Claims for
24 Lincoln, Access Claims was to send copies of claim files only
25 upon Lincoln's request.  (Kirk Depo., pp. 54 and 63-64).  In
26 January of 2005, Lincoln first requested a copy of the full file
for the Dias Claim, and it was immediately sent.  (*Id.* at p. 64).
27 That Lincoln wanted claim files only upon request prior to
28 January of 2005 is also evidenced by Mr. Kirk's email to Access

11

1  Claims which reads in relevant part as follows:

2    This email is to clarify various points pertaining
  to bad faith claim handling as discussed during
3    our recent visit (January 2005) to your office.
  . . .
4
  To ensure some clarity and consistency I will
5    outline two separate procedures to follow on
  existing and future bad faith claims respectively.
6    . . .

7    **The existing [claim files including Dias] will be
  copied and forwarded to George Burke for further**
8    **review. . . .**

9    **New (as of this date) cases that allege bad faith
  are to be reported to Lincoln (George) as soon as**
10    **it is determined that the potential for a viable
  bad faith claim exist (some examples: failure to**
11    **respond timely to a time/policy limit demand;
  receipt of a lawsuit with bad faith allegations).**
12    . . .

13  (Exh. 54) (emphasis added).

14    Accordingly, Access Claims complied with the requirements of
15  § 769.83(g)(2) by sending the Dias Claim to Lincoln "at its
16  request."   More importantly for this private lawsuit, Access
Claims complied with Lincoln's specific directions, i.e., to send
17  claim files only upon request.

18    Fourth, even if Access Claims breached a reporting
19  obligation, that does not generate a fraud claim.  Pennsylvania's
20  economic loss rule bars fraud claims that are intrinsic to the
21  contract.  *See Werwinsky v. Ford Motor Co.*, 286 F.3d 661, 674-681
22  (3d Cir. 2002); *Air Prod. and Chem., Inc. v. Eaton Metal Prod.
Co.*, 256 F.Supp.2d 329, 335-340 (E.D. Pa. 2003).  Given Lincoln's
23  fraud claim's nexus to the performance of the contract itself,
24  the choice of law clause mandates application of Pennsylvania's
25  economic loss rule.   *See William Int'l. Corp. v. New Era
26  Decorative Fabrics, Inc.*, No. B187650, 2007 WL 1866769, at *8
27  (Cal. Ct. App. June 29, 2007).

  Fifth, Lincoln has submitted no evidence of an intentional
28  concealment.  A breach of contract does not equal a fraud.

1   Sixth, Lincoln argues that the temporary lowering of the
2  Dias reserve below $15,000 supports a fraud claim.  But Lincoln
3  admits it has no information as to who allegedly lowered the Dias
   Claim reserves or why such reserves allegedly were lowered.  (*Id.*
4  at p. 25).  Lincoln, therefore, has no information as to the
5  appropriateness of the alleged change in reserves, that the
6  reserves were knowingly false or that Access Claims intended to
7  mislead Lincoln.

8   In any event, Lincoln's fraud claim fails because it has
9  submitted no evidence of, and has not even alleged, actual
   reliance on the temporary change in the reserve.  *See Mirkin v.*
10 *Wasserman*, 5 Cal.4th 1082, 23 Cal.Rptr.2d 101, 858 P.2d 568
11 (1993) (plaintiff in fraud case must allege and prove actual
12 reliance).  Nor has Lincoln shown any damage, i.e., that whatever
13 actual reliance was induced from the small lowering of the
14 reserve actually caused a loss.  *See Agosta v. Astor*, 120
15 Cal.App.4th 596, 603, 15 Cal.Rptr.3d 565 (2004) (damage is
   element of fraud claim).

16  Accordingly, Access Claims is entitled to summary judgment
17 as to Lincoln's fraudulent concealment claim and on any fraud
18 claims relating to the reserves for the Dias Claim.

19  **D.   Any Breach of Duty by Access Claims Did Not Cause
        Lincoln's Alleged Damages.**

20  Access Claims did not cause any of Lincoln's alleged
21 damages.  Accordingly, even if Access Claims breached a
22 contractual duty or the Covenant, Lincoln is still not entitled
23 to indemnification.

24      **1.   Pennsylvania Law Applies to the Claims
             Agreement.**

25  Even if the choice of law clause is construed narrowly, the
26 substantive rights associated with the indemnification clause
27 must be construed under Pennsylvania Law.  (Access Claims'
   Initial Brief, pp. 21-22).  Even Lincoln's president, who
28 negotiated the Claims Agreement, agrees. (Depo. of W. Star, pp.

13
**Defendant's Reply Brief In Support of Motion for Summary Judgment**

19-21).

In response, Lincoln argues that, although Pennsylvania law governs the construction and interpretation of the Claims Agreement, it does not supply the substantive law to govern disputes. (Response, p. 32). While Lincoln's argument may have some merit for some tort claims, it has none with respect to claims under the very contract containing the choice of law clause. To say that a choice of law clause applies, except in the event of a dispute, is to eviscerate it.

### 2. Under Pennsylvania Law, Lincoln Must Prove Actual Liability.

The authority cited in Access Claims' Initial Brief, pp. 22-23, establishes that an indemnitee who settles must prove that he or she (the indemnitee) was actually liable to the claimant. The indemnitee cannot recover by showing "a reasonable possibility" of liability. *"[A]ctual legal liability must be shown." Philadelphia Elec. Co. v. Hercules, Inc.*, 762 F.2d 303, 317 (3d Cir. 1968) (applying Pennsylvania law) (Emphasis added); *PPG Indus., Inc. v. Central Indus. Maint., Inc.*, No 05CV1193, 2006 WL 752982, at *3-4 (W.D. Pa. Mar. 22, 2006).

In response, Lincoln merely argues that a voluntary settlement by an indemnitee before judgment is rendered against the indemnitee does not in itself bar indemnity. (Response, pp. 32-33). Access Claims has never disputed that proposition. Access Claims' point is that Lincoln must show actual liability and cannot do so. Even Lincoln's lead case holds that a settling indemnitee must show actual liability. *See Martinique Shoes, Inc. v. N.Y. Progressive Wood Heel Co.*, 217 A.2d 781 (Pa. Super. 1966). As discussed in Access Claims' Initial Brief at pp. 24-27, and in Parts 4 and 5, below, Lincoln was not actually liable to the Diases, thereby mandating summary judgment in this case.

1

### 3.   California Law Requires Lincoln to Show Actual Liability.

2

3 As discussed in Access Claims' Initial Brief, pp. 23-24,
California law requires a settling indemnitee to prove actual
4 liability, unless (a) the indemnitee demanded that the indemnitor
5 provide a defense for the indemnitee in an action brought against
6 the indemnitee *and* (b) the indemnitor refuses.   Lincoln spends
7 six pages attacking Access Claims' citations but then comes to
the same conclusion:  Lincoln must prove it was actually liable,
8 unless (a) it demanded that Access Claims defend Lincoln, and (b)
9 Access Claims refused.   (Response, pp. 25-31).   Lincoln never
10 demanded that Access Claims defend Lincoln.   Indeed, Lincoln was
11 not a party to a lawsuit Access Claims could defend.

12       Recognizing its failure of proof, Lincoln blurs the
distinction between a demand to defend and a demand to indemnify.
13 (Response, pp. 26-29).   Specifically, Lincoln argues that it
14 "demanded that Access [Claims] defend Lincoln against liability
15 by indemnifying and settling the Dias lawsuit."   (Response, p.
16 26).   But, Lincoln confuses a demand to defend with a demand to
17 indemnify via settlement.   Lincoln never demanded that Access
18 Claims defend it but, under its own allegations, demanded only
that Access Claims pay the Diases to satisfy a potential claim
19 against Lincoln that did not yet exist.   Moreover, Lincoln's
20 request that Access Claims "properly control the direction of
21 this matter" applied only to a February 7, 2005, mandatory
22 pretrial conference at which settlement was not even discussed.
23 (Exhs. 54 and 91, p. 3; Gavin Depo. pp. 79-81).   While a refusal
to defend after demand creates an inference of actual liability,
24 the absence of a demand to defend and a refusal mandates that the
25 indemnitee prove actual liability.   (Access Claims' Initial
26 Brief, pp. 23-24).

27       Finally, although Access Claims was supervising the defense
28 of the Dias case prior to the settlement, Lincoln ordered Access

1 | Claims excluded from settlement and trial preparation with the
2 | following instructions:

3
4
5
6
7

> In an effort to avoid any possible confusion in
> preparation for trial; settlement negotiations;
> and at trial, from this point forward, LGIC will
> . . . direct all future defense strategies and
> settlement negotiations. We request that you
> instruct defense counsel to direct all
> correspondence/requests for authority to [Lincoln
> representatives].

(Exh. 92).

8    Accordingly, Access Claims was meeting any defense
9 | obligations as to the Dias case until barred by Lincoln. The
10 | reality is that Lincoln did not and could not have demanded that
11 | Access Claims defend Lincoln, because Lincoln had not been sued
12 | and could not have been sued. No cause of action yet existed
   | against Lincoln. Accordingly, Lincoln must show it was actually
13 | liable to the Diases or Coleman, which it cannot do. Summary
14 | judgment is appropriate.

15
16

> **4. Lincoln was Not Actually Liable as a Matter
> of Law Because an Excess Judgment had not
> been Rendered Against Coleman.**

17    As stated in Access Claims' Initial Brief, pp. 24-26, at the
18 | time of the settlement, any claim against Lincoln had not ripened
19 | and did not exist. A bad faith claim against Lincoln could have
   | arisen only if (a) the Diases obtained an excess judgment against
20 | Coleman, (b) Coleman paid the excess judgment or assigned his
21 | rights, if any, against Lincoln to the Diases, (c) Coleman or the
22 | Diases, as assigns, brought a bad faith action against Lincoln
23 | and (d) Lincoln lost the bad faith action. Under no analytical
24 | framework was Lincoln actually liable to the Diases or Coleman at
25 | the time of the settlement. Because Lincoln was providing
26 | Coleman with a defense, a bad faith refusal to settle was "not
   | actionable." *Hamilton v. Maryland Cas. Co.*, 27 Cal.4th 718, 727,
27 | 117 Cal.Rptr.2d 318, 41 P.3d 128 (2002). Any bad faith claim
28 | then "was based on a mere possibility that damage could

16
**Defendant's Reply Brief In Support of Motion for Summary Judgment**

1  result...."  *Id.* at 727, 117 Cal.Rptr.2d 318.  "[I]t was possible
2  that [Coleman, Lincoln and Access Claims] would successfully
3  defend the underlying litigation, resulting in a defense judgment
4  for the claimants lower than the ... settlement offer."  *Id.* at
   726, 117 Cal.Rptr.2d 318.

5        Lincoln makes three arguments, none of which has merit.
6  First, Lincoln argues it could seek indemnity without entry of a
7  judgment against Lincoln.  Access Claims does not dispute this
8  point.  If Lincoln were actually liable to the Diases, it could
9  have settled without the entry of a bad faith judgment against
   it.  Lincoln was not actually liable, not because a judgment had
10 not been rendered against *Lincoln* but because an excess judgment
11 had not been rendered against *Coleman*.  *See id.* at 725-28, 117
12 Cal.Rptr.2d. 318 (until a litigated excess judgment is obtained,
13 [the insurer's] refusal to settle is not actionable); *Safeco Ins.*
14 *Co. v. Superior Court*, 71 Cal.App.4th 782, 788, 84 Cal.Rptr.2d 43
15 (1999) (same).

16       Second, Lincoln argues that the *Hamilton* and *Safeco* cases do
   not apply because Access Claims was not an insurer providing a
17 defense to Coleman.  (Response, pp. 30-31).  Lincoln misstates
18 Access Claims' point.  Access Claims does not argue that
19 Lincoln's claims against it are barred because Access Claims was
20 providing a defense.  Rather, Access Claims argues that any
21 potential bad faith claim of Coleman or the Diases against
   Lincoln were barred because Lincoln was providing a defense.
22 Therefore, as a matter of law, Lincoln was not actually liable to
23 the Diases.

24       Third, on page 18 of its Response, Lincoln argues that Cal.
25 Ins. Code Section 11580(b)(2) accorded the Diases the right to
26 sue Lincoln immediately.  Lincoln is wrong.  Cal. Ins. Code
   Section 11580(b)(2) requires a "judgment [be] secured against the
27 insured" before a *judgment creditor* may bring an action against
28 an insurer.  Further, Section 11580 does not in the absence of an

1 assignment provide third party beneficiary status to third-party
2 claimants such as the Diases when they allege a bad faith failure
3 to settle. In fact, the *Murphy* case, relied upon by Lincoln,
4 expressly holds that the third party beneficiary doctrine **does
*not apply*** to a breach of the implied covenant of good faith and
5 fair dealing owed to the insured:

6       Because, as we have seen, the duty to settle is
        intended to benefit the insured and not the
7       injured claimant, third party beneficiary doctrine
        does not furnish a basis for the latter to
8       recover. Moreover, Allstate having paid plaintiff
        the policy limits, she has already received all
9       benefit contemplated by the policy.
10
*Murphy v. Allstate Ins. Co.*, 17 Cal.3d 937, 944, 132 Cal.Rptr.
11 424, 553 P.2d 584 (1976).
12
                **5.    Lincoln Was Not Actually Liable to the Diases
13                       on the Facts.**

14       In its Initial Brief, pp. 26-27, Access Claims stated five
15 reasons why Lincoln was not liable for bad faith. Lincoln does
   not respond to any of them but merely argues that "Access
16 [Claims] failed to respond to the [TLD]." (Response, p. 29).
17 The absence of a response to the TLD does not come close to
18 establishing Lincoln's liability. Not only did Access Claims not
19 receive the TLD and it was reasonable as a matter of law not to
   pay $15,000 for David Dias' claim, but the Diases did not submit
20 their medical records to Access Claims or agree to satisfy
21 medical liens, and the settlement demanded would have left an
22 injured person uncompensated.

23       Lincoln mistakenly believes it need only raise an issue of
24 fact as to Access Claims' negligence. Not only has Lincoln not
25 done so, but it ignores whether Access Claims actually and
   proximately caused the settlement. "[N]egligence in the air, so
26 to speak, will not do." *Ortega v. Kmart Corp.*, 26 Cal.4th 1200,
27 1206, 114 Cal.Rptr.2d 470, 36 P.3d 11 (2001).
28

1    **E.    Lincoln Settled the Dias Claim as a Volunteer and is Not Entitled to Indemnification by Access Claims.**

2

3    Lincoln's settlement was a voluntary payment because
4  (a) Lincoln was not liable to the Diases or to Coleman,
5  (b) Lincoln assumed that the policy limits had been opened, and
6  (c) ignored the liability of the product defendability. (Access Claims' Initial Brief, pp. 28-30). In response, Lincoln repeats
7  its arguments that it was actually liable above policy limits to
8  the Diases or to Coleman. (Response, pp. 32-36). This point was
9  discussed in Part D of this brief.

10    **F.    Lincoln Has Been Reimbursed for All Damages.**

Access Claims argues Lincoln has been reimbursed completely
11  via (a) payment of $498,000 from Kingsway Re under a quota share
12  reinsurance agreement, (b) $1,890,000 from Chubb under a clash
13  reinsurance agreement, and (c) the balance from Kingsway Re under
14  a Loss Portfolio Transfer Agreement ("LPTA"). (Access Claims'
15  Initial Brief, pp. 31-33). Lincoln responds as follows:

16        (a)  Lincoln admits receipt of the $2,388,000 under the
             reinsurance agreements but denies reimbursement of the
17           Settlement under the LPTA. (Response, pp. 36, 39-40);
18        (b)  Lincoln argues that, even if it has been reimbursed,
19            (i) the reinsurers have rights of subrogation and (ii)
20           these rights of subrogation may be asserted by Lincoln
21           (*Id.* at pp. 36-39); and
22        (c)  Even if Lincoln cannot recover the $3.8 million paid to
             settle the Dias Claim, it can recover the cost of
23           defending the Dias Lawsuit (*Id.* at p. 39).

24    None of these arguments have merit and are now discussed
25  separately.

26        **1.    Lincoln was reimbursed under the LPTA for the Settlement.**

27    Access Claims submitted testimony from Gary Orndorff and
28  Shawn Jackson (a) that Lincoln was reimbursed partially under the

19
**Defendant's Reply Brief In Support of Motion for Summary Judgment**

1  LPTA for the Settlement, (b) that *all sums* recovered in this case
2  will go to the reinsurers, with none retained by Lincoln, and (c)
3  that the values received by Lincoln and Kingsway Re under the
4  LPTA were equal.  (Orndorff Depo., pp. 40-41; Jackson Depo., pp.
5  101-103).  Indeed, Lincoln is presumed to have received the value
   of the Dias Claim as transferred to Kingsway Re.  *In re Glacier*
6  *Ins. Co.*, 234 Cal.App.3d 1549, 286 Cal.Rptr. 262 (1991); *Century*
7  *Resid., LLC v. County of Santa Clara*, No. H031985, 2008 WL
8  4750798 (Cal. Ct. App. Oct. 30, 2008).

9      Lincoln's response is two-fold.  First, it attacks Access
   Claims' deposition questions as unclear.  The questions and
10 answers were clear and as follows:

11     Q.  Okay.  So back on the record.  We were saying that
           Exhibit 77 and Exhibit 121 plus you believe one
12         other reinsurance agreement provided reimbursement
           or reinsurance benefits to Lincoln for the Dias
13         claim; is that correct?

14     A.  Correct.

15     Q.  Are you aware of any other agreements other than
           those three that provided any benefits?
16
       A.  The loss portfolio transfer.
17
   (Orndorff Depo., pp. 33-34).
18
       Q   Were you able to find out the sum total of
19         reinsurance or reimbursements Lincoln has received
           for the Dias claim?
20
       A   I have most of the pieces.
21
                            * * *
       A   *The number I don't have would be the amount on the*
22         *loss portfolio transfer.*

23     Q   *And just to be clear, these numbers are for the*
           *3.8 million dollar settlement and any defense*
24         *expenses; is that correct?*

25     A   *That is correct.*

26 (*Id.* at p. 36) (emphasis added).

27     Orndorff's testimony continued as follows:

       Q   If Lincoln were to get a recovery in this
28         litigation, what amounts would Lincoln have to pay

                            20

1          to Kingsway Re from that recovery?

                            * * *

2     A    *So, in essence, we would reimburse 100 percent
3          [of] anything that was paid under the excess
           treaty to either Chubb or K Re, and then the
4          balance of the funds would be paid to K Re under
           the loss portfolio transfer agreement.*
5
      Q    But in what priority, as compared to the other
6          amounts for K Re and Chubb?

7     A    Well, because the -- what would happen is the --
           part would go to the quota share, part would go to
8          Lincoln, but then Lincoln would pick up the LPT or
           cedes to the LPT. *So, in essence, 100 percent of
9          all dollars would go back to K Re either under the
           quota share or the LPT.*
10
(*Id.* at pp. 40-42) (emphasis added).

11
      Accordingly, Orndorff's testimony was unambiguous.  Kingsway
12
Re reimbursed Lincoln under the LPTA for the Settlement and all
13
recoveries  under  this  lawsuit  will  go  to  the  reinsurers,
14
including Kingsway Re under the LPTA.  Shaun Jackson, the CEO of
15
Lincoln's  parent  corporation,  testified  that  the  values
16
transferred both ways under the LPTA were equal.  (Jackson Depo.,
pp. 101-103).

17
      Second,  in  an  effort  to  submit  contrary  evidence  with
18
respect to the LPTA, Lincoln submitted the Declaration of Gary
19
Orndorff in which he testified that the LPTA does not cover any
20
of the $3.8 million or defense costs relating to the Settlement.
21
(Response, pp. 39-40; Orndorff Decl. ¶¶ 3-6, attached to Response
22
at Exh. 18).   Orndorff's declaration as to the contents of the
LPTA is barred for two reasons.  First, under the best evidence
23
rule, only the LPTA itself may serve as evidence of its contents.
24
Fed.R.Evid. 1002 and 1004. *See also United States v. Bennett*, 363
25
F.3d 947, 953 (9th Cir. 2004).   Only admissible evidence may be
26
considered on summary judgment.  Fed.R.Civ.P. 56(e); *Orr v. Bank
of Amer.*, 285 F.3d 764, 773 (9th Cir. 2002).   Second, Federal
27
Rule of Civil Procedure 56(e)(1) states, that "[i]f a paper or
28
part of a paper is referred to in an affidavit, a sworn or

21

1  certified copy must be attached to or served with the affidavit."
2  *School Dist. No. 1J v. ACandS, Inc.*, 5 F.3d 1255, 1261-62 (9th
3  Cir. 1993).   That the affiant claims personal knowledge of the
4  contents of the contract does not excuse attachment.   *Id.* at
   1262; *Boyd v. City of Oakland*, 458 F.Supp.2d 1015, 1023 (N.D.
5  Cal. 2006) (rule applicable to declaration).  *See also Carolina*
6  *Power & Light v. Uranex*, 451 F.Supp. 1044, 1055-1056 (N.D. Cal.
7  1977) (adverse inference rule applied where party with evidence
8  refuses to produce it).[2]

9      Therefore, the only admissible evidence is that Lincoln has
   been reimbursed in full, including payments under the LPTA.
10
11  |  | **2.** | **It is too late for Lincoln to claim it sues for the reinsurers, and any rights of subrogation must be asserted by the particular reinsurer, not by Lincoln.** |
12

13     Lincoln argues that the reinsurers have rights of
14  subrogation that would allow them to seek reimbursement from
15  wrongdoers.   (Response, pp. 36-37).  Lincoln then argues that,
    notwithstanding such alleged subrogation rights, Lincoln has the
16  right to bring this action and remit funds to the reinsurers.
17  Lincoln is wrong for at least two reasons.  First, it is too late
18  for Lincoln to switch positions and assert rights on behalf of
19  reinsurers.  Second, aside from timeliness, and even assuming the
20  reinsurers have rights of subrogation, Lincoln does not own, or
    have the power to assert, those rights.
21
                          **a.    It is too late for Lincoln now to assert**
22                               **the rights of the reinsurers.**

23     At the beginning of this case, Access Claims moved to
24  dismiss on the grounds, *inter alia*, that Lincoln had not been
    damaged because it had been reimbursed via reinsurance.  (Br. in
25

26  ---
    [2]  Access Claims has filed a separate Objection to Orndorff's
27  Declaration, which is the method to assert these objections.
    *Pfingston v. Ronan Eng'g Co.*, 284 F.3d 999, 1003 (9th Cir. 2002);
28  *Boecken v. Gallo Glass Co.*, No. 1:05-cv-00090-OWW-DLB, 2008 WL
    4470867, at *2 (E.D. Cal. 2008).

**Defendant's Reply Brief In Support of Motion for Summary Judgment**

1 Supp. of Mot. to Dismiss, pp. 21-24). In response, Lincoln
2 argued that, under the collateral source rule, it could recover
3 twice. (Pl's Mem. of P. & A. in Opp'n to Def.'s Mot. to Dismiss,
4 pp. 16-17). In its Order, this Court found the collateral source
5 rule applied and held that, while Lincoln could not recover
  amounts already reimbursed, it might be able to recover amounts
6 not reimbursed. (Order pp. 20-22, Aug. 30, 2007).

7    Lincoln now shifts its position completely, and claims, not
8 that it has rights of reimbursement, but that it can assert the
9 rights of the reinsurers. Not only is Lincoln wrong as to its
  rights, but it should not be allowed now to change the thrust of
10 this case after discovery is closed and put Access Claims at risk
11 for future litigation.

12          **b.   Lincoln cannot assert the rights of the
                   reinsurers.**
13
    The identity of the real party in interest is governed by
14 state law. *Glacier Gen. Assur. Co. v. G. Gordon Symons Co.*, 631
15 F.2d 131, 133-34 (9th Cir. 1980). While Lincoln recognizes the
16 applicability of state law, it erroneously assumes California law
17 applies. (Response, pp. 36-39). To the contrary, each reinsurance
18 agreement must be analyzed separately as to choice of law.

    Most of the reinsurance reimbursement, $1,890,000, was
19 provided under the clash reinsurance agreement.   (Exh.   77;
20 Orndorff Depo., p. 36).   The clash reinsurance agreement
21 expressly states it is to be governed and construed under
22 Illinois law.   (Exh. 77, p. 13).   Under Illinois law, the
23 subrogee owns and controls all rights acquired by subrogation,
   including partial subrogation. *State Sec. Ins. Co. v. Frank B.*
24 *Hall & Corp*, 109 F.R.D. 99 (N.D. Ill. 1986); *Blatz v. City of*
25 *Rock Falls*, 434 N.E.2d 807 (Ill. App. 1982). Accordingly, to the
26 extent of the $1,890,000 reimbursed under the clash reinsurance
27 agreement, Lincoln has not been damaged and cannot assert the
28 reinsurers' purported rights of subrogation.

1       The quota share reinsurance agreement incorporates
2 Pennsylvania law. (Exh. 121, Art. 23). That is not surprising,
3 since Lincoln is based in Pennsylvania. Pennsylvania law
4 recognizes the subrogee as the real party in interest. *Frantz*
*Tractor Co. v. Providence Wash. Ins. Co.*, 119 A.2d 495 (Pa.
5 1956). Although Pennsylvania's procedural rules allow a subrogee
6 to sue in the name of the subrogor, that is a matter of
7 Pennsylvania procedural law. *See* Pa.R.Civ.P. 2002(d); *Beachwoods*
8 *Flying Svc. Inc. v. Al Hamilton Contracting Co.*, 476 A.2d 350
9 (Pa. 1984). Even the Rule and the case law recognize that the
subrogee is still the real party in interest. While state law
10 provides the substantive law to identify the real party in
11 interest, federal law governs who may sue, and federal law allows
12 only the real party in interest to assert a cause of action.
13 *Glacier*, 631 F.2d at 133-134. Quirks of state law, such as
14 Pennsylvania's rule allowing a subrogee to sue in the name of the
subrogor, are of no matter. *Id.* (while Montana law identifies
15 "real party in interest," Montana procedure allowing forced
16 joinder of other parties not applicable).

17       Finally, while California law allows an action to be brought
18 in the name of a subrogor, where the subrogation is partial, only
19 the subrogee may bring the action where the subrogor has been
20 paid in full. *See Malibu Broadbeach L.P. v. State Farm Gen. Ins.*
*Co.*, No. B195286, 2008 WL 588998 (Cal. Ct. App. March 5, 2008).
21 For the reasons stated previously and in Access Claims' Initial
22 Brief, pp. 31-33, Lincoln has been paid in full.

23         **3.**   **<u>Lincoln Cannot Recover the Costs of Defending</u>**
             **<u>Coleman.</u>**
24
25       Lincoln argues that, even if it has been reimbursed for the
$3.8 million Settlement, it still has claims for attorneys' fees,
26 experts, etc. in defending the Coleman. (Response, p. 39).
27 Lincoln is wrong on the law and the facts. First, under both the
28 quota share reinsurance agreement and the clash reinsurance

1 agreement, the reinsurers cover portions of those litigation
2 expenses.  (Exh. 121, Art. 5(B); Exh. 77, Arts. VII(A), VIII(C);
3 Orndorff Depo. pp. 28, 36 and 78-80).  The evidence also reflects
4 that Lincoln was reimbursed under the LPTA for any shortfall in
litigation expenses.  (Orndorff Depo. pp. 36, 40-42).

5     In any event, Lincoln is not entitled to indemnification for
6 the costs of defending Coleman.  Under the Policy, Lincoln was
7 obligated to provide a defense regardless of the insurance
8 limits.  While Lincoln might have a claim for the costs of
9 defending *Lincoln* in litigation brought *against Lincoln* to
recover an identifiable claim, Lincoln cannot use the indemnity
10 clause to shift its legal responsibilities under the Policy. *See*
11 Cal. Civ. Code § 2778(3) (indemnity includes "costs of defense
12 against such claims . . .," i.e. costs of defending against
13 litigation brought against Lincoln).

14                         III.  **CONCLUSION**

15     For the reasons stated herein and in the Initial Brief,
Access Claims is entitled to summary judgment as a matter of law.
16     This 3rd day of December, 2008.

17                         MORRIS, MANNING & MARTIN, LLP

18

19                         _____

20                         Lewis E. Hassett
                          Georgia Bar No. 336140
                          Jessica F. Pardi
21                         Georgia Bar No. 561204

22                         Attorneys for Access Claims
                          Administrators, Inc.
23

24

25

26

27

28

1  Lewis E. Hassett, Esq.
   Jessica F. Pardi, Esq.
2  **MORRIS, MANNING & MARTIN, LLP**
   1600 Atlanta Financial Center
3  3343 Peachtree Road
4  Atlanta, Georgia 30326
   Telephone:  (404) 233-7000;
5  Facsimile:   (404) 365-9532

6  Robert E. Davies, Esq., SBN 106810
   **CAULFIELD, DAVIES & DONAHUE LLP**
7  P.O. Box 277010
   Sacramento, CA 95827-7010
8  Telephone: (916) 817-2900
   Facsimile: (916) 817-2644
9
   Mona Z. Hanna, Esq., SBN 131439
10 **MICHELMAN & ROBINSON, LLP**
   4 Hutton Centre Drive, Suite 300
11 Santa Ana, California 92707
   Telephone:    (714) 557-7990;
12 Facsimile:   (714) 557-7991

13 **Attorneys for Defendant:**
   **ACCESS CLAIMS ADMINISTRATORS, INC.**
14
                    UNITED STATES DISTRICT COURT
15                  EASTERN DISTRICT OF CALIFORNIA
                        SACRAMENTO DIVISION
16
   LINCOLN GENERAL INSURANCE        ) Case No. 2:07-cv-01015-LKK-EFB
17 COMPANY,                         )
                                    )
18            Plaintiff,            ) **DEFENDANT'S REPLY BRIEF IN**
                                    ) **SUPPORT OF MOTION FOR SUMMARY**
19      v.                          ) **JUDGMENT**
                                    )
20                                  )
   ACCESS CLAIMS ADMINISTRATORS,    )
21 INC., and DOES 1 through 75,     ) Hearing Date:    1/12/2009
   inclusive, et al.,               ) Hearing Time:    10:00 a.m.
22                                  ) Hearing Judge:   Hon. Lawrence Karlton
                                    ) Hearing Dept.:   Courtroom 4
            Defendants.             ) Complaint Filed: April 9, 2007
23 _ _ _ _ _ _ _ _ _ _ _ _ _ _ _ _  ) Trial Date: June 16, 2009

24
                       **CERTIFICATE OF SERVICE**
25

26

27

28

                                  26
          **Defendant's Reply Brief In Support of Motion for Summary Judgment**

1        I hereby certify that I electronically filed with the Clerk

2    of Court the foregoing DEFENDANT'S REPLY BRIEF IN SUPPORT OF

3    MOTION FOR SUMMARY JUDGMENT using the CM/ECF system which will

4    automatically send email notification of such filing to the

5    following attorneys of record:

6                  Brian P. Worthington, Esq.
              Ryan Mercaldo & Worthington LLP

7                  3636 Nobel Drive, Suite 200
              San Diego, California  92122

8

9                  Steven W. Zoffer, Esq.
              Frederick W. Bode, III, Esq.

10                 Dickie, McCamey & Chilcote, P.C.
              Two PPG Place, Suite 400

11                 Pittsburgh, Pennsylvania  15222-5402

12       This  3rd  day of December, 2008.

13                       MORRIS, MANNING & MARTIN, LLP

14

15

16                       Jessica F. Pardi
                    Georgia Bar No. 561204

17                       Attorneys for Access Claims
                    Administrators, Inc.

18

19   1600 Atlanta Financial Center
3343 Peachtree Road, N.E.

20   Atlanta, Georgia 30326
Phone: (404) 233-7000

21   Fax: (404) 365-9532

22

23

24

25

26

27

28