UNITED STATES DISTRICT COURT

FOR THE EASTERN DISTRICT OF CALIFORNIA

LINCOLN GENERAL INSURANCE
COMPANY,

        Plaintiff,

    v.

ACCESS CLAIMS ADMINISTRATORS,
INC., and DOES 1 through 75,
inclusive, et al.,

        Defendants.

_____/

NO. CIV. S-07-1015 LKK/EFB

O R D E R

    This is an action brought by an insurance company, Lincoln General Insurance Company ("Lincoln"), against its corporate claims administrator, Access Claims Administrators ("Access"), over the alleged mishandling of a claim arising from an automobile accident. Pending before the court is defendant's motion for summary judgment. The court resolves the motion upon the papers and after oral argument.

////

////

////

1

# I. FACTS[1]

Lincoln brought suit against Access, a claim administrator. Compl. ¶¶ 1-2. Lincoln is an insurance company that writes automobile policies in California and various other states. Defendant's Statement of Undisputed Facts ("Def.'s SUF") ¶ 1. Pursuant to a Claims Service Agreement between the parties, Access administered claims for Lincoln's California nonstandard insurance program. Def.'s SUF ¶ 2. Access, in its capacity as a claims administrator, provided a number of services for Lincoln, including investigating liability and negotiating claims through settlement or final disposition and issuing all claim payments with funds provided by Lincoln; preparing and filing all reports; and coordinating, directing and managing litigation activity. Access' Deposition Exhibit 1 In Support of Defendant's Motion for Summary Judgment ("Claims Service Agreement") at 1-2. In the present action, Lincoln alleges that Access mishandled a claim that arose out of an automobile accident and a subsequent third-party personal injury claim, which Lincoln eventually settled.  The complaint alleges three causes of action: (1) breach of contract, (2) breach of good faith and fair dealing, and (3) fraud/intentional deceit.[2]

---

[1]All facts are undisputed unless otherwise noted.
Each party has objected to various pieces of evidence tendered by the other. Some of the evidence to which an objection has been made is irrelevant to the court's analysis of the summary judgment motion. To the extent that the evidence is relevant, the objections are OVERRULED, except as discussed in note 19, *infra*.

[2] The original complaint also alleged causes of action for negligence and negligent misrepresentation, which have since been dismissed. See Order, Aug. 29, 2007.

**A.    The Dias Claim**

On March 4, 2003, Manuel Coleman and his two daughters, Shyan and Lanisha, were injured in an automobile accident with David and Diana Dias ("the Diases"). Def.'s SUF ¶ 5. As a result of the accident, Diana Dias was rendered a paraplegic, Lanisha Coleman suffered neck and back injuries and Shyan Coleman sustained a head injury. Def.'s SUF ¶ 7. At the time, Coleman was insured under a Lincoln policy (the "policy"). Def.'s SUF ¶ 3. The policy had bodily injury limits of $15,000 per person and $30,000 per accident. Def.'s SUF ¶ 4. Coleman denied liability for the accident because he was rear-ended by a hit-and-run vehicle. Def.'s SUF ¶ 8. Coleman's daughters and the Diases filed claims under the policy. Def.'s SUF ¶ 9. Pursuant to the Claims Service Agreement between Access and Lincoln, Access was to handle the defense of the Diases's lawsuit. Claims Service Agreement at 1, ¶ 4.

In January 2004, Access adjustor Tracy Eggers ("Eggers") was handling the Dias' claim on behalf of Access. Def.'s SUF ¶ 15. Eggers's notes indicate that he concluded that Coleman was 100 percent at fault for the accident. Deposition of Tracy Eggers ("Eggers Depo.") at 70:5-72:25. Eggers set the bodily-injury reserves for David and Diana Dias at the maximum policy limit of $15,000 per person and $30,000 per accident. Id. at 32:15-17. Although Eggers does not know the reason, an unknown employee of Access reduced the reserves Eggers had set for the Diases to a lower number. Id. at 89:10-90:22.

////

## B.   The Diases' Demand Letter

Lincoln alleges that on October 8, 2003 the Dias' attorney, Gary Dolinski, sent a letter to Eggers asking whether Coleman's daughters were making a claim for injuries as a result of the car accident with the Diases. Lincoln's Deposition Exhibit 8 In Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgement. Dolinski wrote Eggers on several subsequent occasions, following up on the issues raised in the October 8 letter and complaining that no one had responded to him. Lincoln's Deposition Exhibits 9, 10, 11 In Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgement; Deposition of Gary Dolinski ("Dolinksi Depo.") at 15-21.

On January 20, 2004, Dolinski prepared a time-limited joint demand for the full $30,000 policy limits for both Diana Dias and David Dias. Def.'s SUF ¶ 10. The demand letter included a ten-day deadline requiring a response by January 30, 2004. Def.'s SUF ¶ 11. Access did not respond to the January 20 demand letter prior to close of business on January 30, 2004. Access' Deposition Exhibits 138A, 139 In Support of Defendant's Motion for Summary Judgment; Dolinski Depo. at 28:12-15. On January 30, 2004, Dolinksi's firm faxed two letters to Access discussing the time-limited settlement demand ("the January 30 Letters"). Access' Deposition Ex. 138A, 139. The first letter was faxed in the afternoon, stating:

> It is now 5:00 p.m. E.S.T., your time on the East Coast.
> . . Access General and Lincoln General had (sic.) Until
> **today at 5:00 p.m., P.S.T., our time here in California**.
> . . Absent timely acceptance of the policy limits demand
> today, Lincoln General will be responsible for the

1  entire verdict that my clients are awarded in this
   case...Again, this demand expires *TODAY AT 5:00 P.M.*
2  *WEST COAST TIME.* Unless it is timely accepted as
   instructed in my letter of January 20, the demand will
3  not be renewed again.

4  Access' Deposition Ex. 138A (emphasis in original). The second

5  letter was faxed after 5:00 P.M. Pacific Standard Time on the same

6  day. The second letter stated, "We are writing now to confirm that

7  since you did not accept the demand, the demand has expired. If

8  your understanding is other than above, please so advise me,

9  immediately." Access' Deposition Ex. 139.

10      Eggers has testified that although he was ill during part of

11  January 2004, he came to work for portions of each workday for that

12  month to keep abreast of claim-related mail. Def.'s SUF ¶ 16.

13  Eggers testified that he did not receive the demand letter or

14  follow-up correspondence. Eggers Depo. at 96:10-98:15. According

15  to Lincoln, a fax confirmation shows successful transmission of

16  both the demand letter to Access on January 20, 2004 and the first

17  of two letters sent on January 30, 2004. Access' Deposition Ex. 139

18  at D00479-480. Access, however, has tendered evidence that Dolinski

19  had no personal knowledge of the delivery of the demand letter or

20  January 30, 2004 letters and could not testify that the letters

21  were accurately faxed. Dolinski Depo. at 22:13-22, 29:18-24, 57:21-

22  58:13.

23      To buttress its contention that Access received the letters,

24  Lincoln offers evidence that the demand letter and the January 30,

25  2004 letters were produced by Access when Lincoln demanded Access'

26  claims file for the Dias claim and the subsequent Dias lawsuit.

5

1   Declaration of Brian P. Worthington, In Support of Plaintiff's

2   Opposition to Defendant's Motion for Summary Judgement

3   ("Worthington Decl.") ¶¶ 9-10. Access adjustor Sally Walsh also saw

4   the January 20 Demand Letter and the January 30 letters in Access'

5   claims file for the Dias claim sometime before the settlement of

6   the Dias lawsuit. Deposition of Sally Walsh ("Walsh Depo.") at

7   13:9-18:15.   Finally, Lincoln notes that on February 10, 2004,

8   Eggers wrote Dolinksi stating, "I apologize for any delay in

9   evaluating documents submitting by your office. I have been out of

10  the office with a series of illnesses . . . I expect to be able to

11  address your faxes and calls by the end of the week." Lincoln's

12  Deposition Exhibit 15 In Support of Plaintiff's Opposition to

13  Defendant's Motion for Summary Judgement.

14  **C.   Access's Communications With the Diases's Counsel**

15      The Diases took the position that Lincoln, through Access,

16  "opened" the $30,000 limit on the policy by failing to respond to

17  the demand letter.[3] Def.'s SUF ¶ 19. On February 11, 2004, a lawyer

18  in Dolinski's firm, Joseph Carcione, wrote to Access that, "Because

19  no one at [Access] replied to Mr. Dolinski's policy limits demand

20  in a timely manner, California law provides that Lincoln General

21  will be responsible for whatever the verdict is that my clients are

22  awarded in this case." Lincoln's Deposition Exhibit 17 In Support

23  _____

24      [3] The court understands the term "opened," to refer to a
    situation when an insurance company may become liable for an amount
25  in excess of its policy limits arising from the insurer's breach
    of its duty of good faith by failing to accept reasonable
26  settlement offers. See PPG Industries, Inc. v. Transamerica Ins.
    Co., 20 Cal. 4th 310, 315 (1999).

1   of Plaintiff's Opposition to Defendant's Motion for Summary

2   Judgement. Eggers testified to having received this letter. Eggers

3   Depo. at 101:14-102:3. Even though Eggers received this letter, he

4   has no recollection of corresponding or attempting to contact

5   Dolinski or Carcione before May 20, 2004. Id. at 101:14-104:15.

6   Moreover, Eggers never told Dolinski that Access had not received

7   the January 20 Demand Letter. Dolsinki Depo. at 29:7-17.

8       Eggers wrote to Carcione on May 20, 2004 requesting

9   documentation of the Dias' injuries. Eggers Depo. at 104:20-23.

10   In that letter, Eggers did not ask Carcione to clarify what he was

11   referring to in his February 11, 2004 letter when he stated that

12   no one at Access had timely replied to Dolinski's Demand Letter.

13   Id. at 104:24-107:6. Access has been unable to produce or locate

14   a copy of this May 20, 2004 letter. Worthington Decl. ¶ 11.

15       Eggers wrote Dolinski's firm another letter on July 8, 2004

16   seeking the "status as to demand packages for [Dolinski's]

17   clients." Lincoln's Deposition Ex. 16 In Support of Pl.'s Opp'n to

18   Def.'s Mot. for Summ. J. This letter does not mention that Access

19   had never received a policy limits demand from Dolinski's firm. Id.

20   **D.   Dias Litigation**

21       Although the Diases's attorney purportedly sent the demand

22   letter to Access on January 20, 2004, Lincoln claims it first heard

23   about the claim at the end of January, 2005, a year later. Kirk

24   Decl. ¶¶ 2-3; see also Def.'s SUF ¶ 37.

25       Per the Claims Service Agreement between Lincoln and Access,

26   Access was required to "coordinate, direct and manage litigation

activity" to Access. Claims Service Agreement at 1, ¶ 4. In addition, Access was responsible for "assigning defense" to an attorney chosen from an approved legal counsel list subject to Lincoln's control. Access maintains that they properly retained California lawyers for Lincoln. They hired Attorney James Haigh to provide an opinion for Lincoln as to whether the policy limits had opened. Def.'s SUF ¶ 40. Lincoln used Haigh's brief in the Second Mediation, to argue that the policy limits had not opened. Def.'s SUF ¶ 41. In addition, Access hired law firm Tharpe & Howell to defend Coleman. Def.'s SUF ¶ 42.

Lincoln chose not to continue with any counsel provided by Access and instead retained attorney Clark Burnham to evaluate Lincoln's exposure in the Dias lawsuit. Plaintiff's Statement of Undisputed Facts ("Pl.'s SUF") ¶ 38. Burnham advised Lincoln that a "probability" exists that they "would face an excess exposure" and stated "this is a case you want to settle." Deposition of Clark Burnham ("Burnham Depo.") at 66:5-18, 68:6-14. Lincoln wrote Access on January 25, 2005 maintaining that because of "Access' poor or improper handling of the [Dias] claim" they expected to be "reimbursed all funds above the policy limits." Lincoln's Deposition Exhibit 54 In Support of Plaintiff's Opposition to Defendant's Motion for Summary Judgement at 3. Lincoln wrote Access again on February 2, 2005 noting that they expected Access to control the litigation in the Dias matter and asking "What specific amount, if any, does Access plan on having available for settlement purposes on the 7th?... It is the position of Lincoln that any

1  extra contractual exposure is the responsibility of Access and/or

2  Access' E&O carrier." Id. at 1.

3      The Diases eventually demanded $10 million to settle their

4  claim. Def.'s SUF ¶ 20.   Lincoln sent letters prior to the

5  mediation of the Dias claim demanding Access' attendance, that they

6  be "prepared to resolve this case" and "seeking [Access'] input."

7  Lincoln's Deposition Exhibits 82, 93 In Support of Plaintiff's

8  Opposition to Defendant's Motion for Summary Judgement. Lincoln has

9  tendered evidence that despite its request, Access provided no

10 defense strategy to Lincoln and Access representatives attended the

11 Dias mediation with no authority to offer any money toward

12 settlement. Kirk Depo. at 94:19-95:24; Deposition of Jerry Morris

13 ("Morris Depo.") at 51:10-52:16. Lincoln asserts that Access

14 offered nothing towards the settlement of the Dias lawsuit beyond

15 "help with regards to the defenses to be used in the upcoming

16 trial." Deposition of Michael Meadows (Meadows Depo.") at 213:20-

17 25.

18     The Dias lawsuit was mediated on March 10, 2004, with both

19 representatives from Access and Lincoln present, and again on March

20 28, 2004, with only Lincoln's representatives in attendance. Def.'s

21 SUF ¶¶ 27, 29. Lincoln claims to have excluded Access from the

22 second mediation because "Access was not willing to offer money

23 toward any settlement, and because Lincoln had already asked for

24 Access' input on settlement strategy but had received no response."

25 Pl.'s SUF ¶ 47.

26     Lincoln settled the Dias claim on March 30, 2005 for $3.8

1

2

3  million, to "mitigate its exposure and protect its insured from

4  personal liability." Declaration of Tim Kirk In Support of

5  Plaintiff's Opposition to Defendant's Motion for Summary Judgment

6  Lincoln ("Kirk Decl.") ¶ 9. Access contends that it was not

7  consulted about this settlement. Def.'s SUF ¶ 32.

8  **F.   The Diases' Products Liability Lawsuit**

9       On March 3, 2005, the Diases filed a products liability

10  lawsuit (the "Products Lawsuit") against Billings Chevrolet-Geo,

11  Inc., General Motors Corp., and Les Schwab Tire Centers of

12  California, Inc. Tuff County, Inc. was later added as a defendant

13  to the products liability suit. The lawsuit sought damages for the

14  injuries sustained by the Diases as a result of the auto accident

15  with the Colemans. Def.'s SUF ¶¶ 45, 47. Lincoln chose not to

16  pursue any claims against the defendants in the products liability

17  lawsuit. Def.'s SUF ¶ 49. The products lawsuit settled out of court

18  for an undisclosed amount.[4] Def.'s SUF ¶ 48.

19  **G.   Lincoln's Reinsurance**

20       Lincoln is a party to several reinsurance agreements, through

21  which it has received $498,000 from Kingsway Reinsurance

22  Corporation of Barbados and $1,890,000 under a clash reinsurance

23  agreement with Kingsway and Chubb Reinsurance, Inc. Def.'s SUF ¶¶

24

_____

25       [4]Pursuant to the court's order and the July 1, 2008 protective

26  order in this case, the amount of the settlement of the Diases'
    products liability suit has been sealed.

1  50-51. Lincoln also had a separate Loss Portfolio Transfer

2  Agreement ("LPTA") with Kingsway. Def.'s SUF ¶ 52. Access and

3  Lincoln dispute whether Lincoln received any reimbursement for the

4  Dias settlement or the costs of defending Coleman under the LPTA.

5  See Declaration of Gary Orndorff In Support of Pl.'s Opp'n to Mot.

6  for Summ. J. ("Orndorff Decl.") ¶¶ 2-6; Orndorff Depo. at 40:13-

7  41:6. Access has tendered evidence, however, that "100 percent" of

8  whatever recovery Lincoln is awarded in the instant suit would go

9  to its reinsurers under either the reinsurance agreement, the clash

10  reinsurance agreement, or the LPTA. Orndorff Depo. at 40:13-41:6.

11      **II. SUMMARY JUDGMENT STANDARD UNDER FEDERAL RULE OF CIVIL**

12                        **PROCEDURE 56**

13      Summary judgment is appropriate when it is demonstrated

14  that there exists no genuine issue as to any material fact,

15  and that the moving party is entitled to judgment as a matter

16  of law.  Fed. R. Civ. P. 56(c); Adickes v. S.H. Kress & Co.,

17  398 U.S. 144, 157 (1970); Poller v. Columbia Broadcast System,

18  368 U.S. 464, 467 (1962); Jung v. FMC Corp., 755 F.2d 708, 710

19  (9th Cir. 1985); Loehr v. Ventura County Community College

20  Dist., 743 F.2d 1310, 1313 (9th Cir. 1984).

21      Under summary judgment practice, the moving party

22      [A]lways bears the initial responsibility of
        informing the district court of the basis for its
23      motion, and identifying those portions of "the
        pleadings, depositions, answers to interrogatories,
24      and admissions on file, together with the
        affidavits, if any," which it believes demonstrate
25      the absence of a genuine issue of material fact.

26

1  <u>Celotex Corp. v. Catrett</u>, 477 U.S. 317, 323 (1986). "[W]here

2  the nonmoving party will bear the burden of proof at trial on

3  a dispositive issue, a summary judgment motion may properly be

4  made in reliance solely on the 'pleadings, depositions,

5  answers to interrogatories, and admissions on file.'" <u>Id</u>.

6  Indeed, summary judgment should be entered, after adequate

7  time for discovery and upon motion, against a party who fails

8  to make a showing sufficient to establish the existence of an

9  element essential to that party's case, and on which that

10 party will bear the burden of proof at trial.  <u>Id</u>. at 322.

11 "[A] complete failure of proof concerning an essential element

12 of the nonmoving party's case necessarily renders all other

13 facts immaterial." <u>Id</u>. In such a circumstance, summary

14 judgment should be granted, "so long as whatever is before the

15 district court demonstrates that the standard for entry of

16 summary judgment, as set forth in Rule 56(c), is satisfied."

17 <u>Id</u>. at 323.

18      If the moving party meets its initial responsibility, the

19 burden then shifts to the opposing party to establish that a

20 genuine issue as to any material fact actually does exist.

21 <u>Matsushita Elec. Indus. Co. v. Zenith Radio Corp.</u>, 475 U.S.

22 574, 586 (1986); <u>First Nat'l Bank of Arizona v. Cities Serv.</u>

23 <u>Co.</u>, 391 U.S. 253, 288-89 (1968); <u>Ruffin v. County of Los</u>

24 <u>Angeles</u>, 607 F.2d 1276, 1280 (9th Cir. 1979), <u>cert. denied</u>,

25 455 U.S. 951 (1980).

26 ////

1    In attempting to establish the existence of this factual

2 dispute, the opposing party may not rely upon the denials of

3 its pleadings, but is required to tender evidence of specific

4 facts in the form of affidavits, and/or admissible discovery

5 material, in support of its contention that the dispute

6 exists. Rule 56(e); Matsushita, 475 U.S. at 586 n. 11; First

7 Nat'l Bank, 391 U.S. at 289; Strong v. France, 474 F.2d 747,

8 749 (9th Cir. 1973). The opposing party must demonstrate that

9 the fact in contention is material, i.e., a fact that might

10 affect the outcome of the suit under the governing law,

11 Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986);

12 T.W. Elec. Serv., Inc. v. Pacific Elec. Contractors Ass'n, 809

13 F.2d 626, 630 (9th Cir. 1987), and that the dispute is

14 genuine, i.e., the evidence is such that a reasonable jury

15 could return a verdict for the nonmoving party, Anderson, 242

16 U.S. 248-49; Wool v. Tandem Computers, Inc., 818 F.2d 1433,

17 1436 (9th Cir. 1987).

18    In the endeavor to establish the existence of a factual

19 dispute, the opposing party need not establish a material

20 issue of fact conclusively in its favor. It is sufficient that

21 "the claimed factual dispute be shown to require a jury or

22 judge to resolve the parties' differing versions of the truth

23 at trial." First Nat'l Bank, 391 U.S. at 290; T.W. Elec.

24 Serv., 809 F.2d at 631. Thus, the "purpose of summary judgment

25 is to 'pierce the pleadings and to assess the proof in order

26 to see whether there is a genuine need for trial.'"

1  <u>Matsushita</u>, 475 U.S. at 587 (quoting Fed. R. Civ. P. 56(e)

2  advisory committee's note on 1963 amendments); <u>International

3  Union of Bricklayers v. Martin Jaska, Inc.</u>, 752 F.2d 1401,

4  1405 (9th Cir. 1985).

5       In resolving the summary judgment motion, the court

6  examines the pleadings, depositions, answers to

7  interrogatories, and admissions on file, together with the

8  affidavits, if any. Rule 56(c); <u>Poller</u>, 368 U.S. at 468; <u>SEC

9  v. Seaboard Corp.</u>, 677 F.2d 1301, 1305-06 (9th Cir. 1982). The

10 evidence of the opposing party is to be believed, <u>Anderson</u>,

11 477 U.S. at 255, and all reasonable inferences that may be

12 drawn from the facts placed before the court must be drawn in

13 favor of the opposing party, <u>Matsushita</u>, 475 U.S. at 587

14 (citing <u>United States v. Diebold, Inc.</u>, 369 U.S. 654, 655

15 (1962) (per curiam)); <u>Abramson v. University of Hawaii</u>, 594

16 F.2d 202, 208 (9th Cir. 1979). Nevertheless, inferences are

17 not drawn out of the air, and it is the opposing party's

18 obligation to produce a factual predicate from which the

19 inference may be drawn. <u>Richards v. Nielsen Freight Lines</u>, 602

20 F. Supp. 1224, 1244-45 (E.D. Cal. 1985), <u>aff'd</u>, 810 F.2d 898,

21 902 (9th Cir. 1987).

22      Finally, to demonstrate a genuine issue, the opposing

23 party "must do more than simply show that there is some

24 metaphysical doubt as to the material facts. . . . Where the

25 record taken as a whole could not lead a rational trier of

26 fact to find for the nonmoving party, there is no 'genuine

1  issue for trial.'" <u>Matsushita</u>, 475 U.S. at 587 (citation

2  omitted).

3  ### III. ANALYSIS

4      Access has brought a motion for summary judgment against

5  Lincoln for the remaining three causes of action: (1) breach

6  of contract, (2) breach of good faith and fair dealing, and

7  (3) fraud/intentional deceit. The court considers each in

8  turn.

9  **A.   Breach of Contract**

10      A cause of action for breach of contract includes four

11  elements: that a contract exists between the parties, that the

12  plaintiff performed his contractual duties or was excused from

13  nonperformance, that the defendant breached those contractual

14  duties, and that plaintiff's damages were a result of the

15  breach. <u>Reichert v. General Ins. Co.</u>, 68 Cal.2d 822, 830

16  (1968); <u>First Commercial Mortgage Co. v. Reece</u>, 89 Cal.

17  App.4th 731, 745 (2001). Here, the parties appear not to

18  dispute that a contract existed between them and that Lincoln

19  fully performed under the contract. Instead, the dispute

20  centers on whether Access breached and, if so, whether Lincoln

21  suffered damages as a result.

22      Lincoln has alleged that Access breached the Claims

23  Agreement in two ways:

24        a)By failing to properly investigate
    liability, damages and coverages;
25        evaluate, negotiate claims through
    settlement or final disposition; and issue

26

15

                    all claim payments with funds provided by
                    Lincoln General; and

                    b)By failing to properly prepare and file
                    all reports and handle all claims in
                    accordance with established claims
                    procedures and California Department of
                    Insurance guidelines.[5]

Compl. ¶ 21. The court considers each allegation in turn.

    **1.   Access' Failure to Respond to the Diases' Demand**

           **Letter**

           **a.   Evidence of Breach**

    The pertinent provision of the contract between Lincoln

and Access requires that Access "Investigate liability,

damages and coverages, evaluate, negotiate claims through

settlement or final disposition. . ." Claims Service Agreement

at 1, ¶ 1. The crux of Lincoln's first allegation for breach

of contract is that Access failed to respond, in any way, to

the Diases' January 20, 2004 Demand Letter and that failure

constituted a breach of this provision of the contract, as

well as exposed Lincoln to a claim for "bad faith liability"

brought by Coleman.

////

////

////

_____

    [5] Plaintiff also alleged that defendant breached the contract
"by failing to properly coordinate, direct and manage litigation
activity." Compl. ¶ 21(c). In its opposition to defendant's motion,
plaintiff does not address this ground for its breach of contract
claim. The court therefore assumes that it has abandoned this
ground for the claim.

1   Under California law[6], "[i]f contractual language is clear
2   and explicit, it governs." <u>Bank of the West v. Superior Court</u>,
3   2 Cal. 4th 1254, 1264 (1992). Contracts should be interpreted
4   by their plain language, unless doing so would result in an
5   absurd construction. Cal. Civ. Code § 1638. The entire
6   contract should be read together as a whole, giving effect to
7   every part. <u>Id.</u> § 1641. When a contract has been reduced to
8   writing, the intent of the parties should be ascertained by
9   the writing alone. <u>Id.</u> § 1639.

10   Lincoln has tendered some evidence from which a jury
11   could find that Access breached the contract by failing to
12   respond to the Diases' January 20, 2004 Demand Letter.
13   Preliminarily, there is some evidence that Access in fact
14   received the demand letter. First, Lincoln notes that there
15   are fax confirmations for the January 20 letter and for the
16   first of the two follow-up letters faxed on January 30, 2004.
17   Access Deposition Ex. 139 at D00479-480. The fax confirmations
18   could lead a reasonable factfinder to believe that they were
19   received by Access' office. Second, in January 2005, when an
20   agent of Lincoln's was conducting an audit of Access' files,
21   he saw the Demand Letter and the two January 30, 2004 follow-
22   up letters in the Dias claim file. Kirk Decl. ¶¶ 2-3. Access

24   [6] As the court explained in its August 29, 2007 order,
25   California law applies to all disputes arising from the
     relationship between Access and Lincoln, unless the construction
26   or interpretation of the contract were at issue, in which case
     Pennsylvania law would apply.

17

1  adjustor Sally Walsh also saw the three letters in the Access

2  claims file sometime before the Dias lawsuit settled. In

3  addition, the three letters were in the documents Access

4  produced because of this lawsuit, when Lincoln demanded

5  Access' file from the Dias claim. Worthington Decl. ¶¶ 9-10.

6      Third, Lincoln notes that on February 10, 2004, Access

7  claims agent Tracy Eggers sent a fax to the Dias' attorney,

8  stating that he had been sick and apologizing for the "delay

9  in evaluating documents submitted by your office," and saying

10 he would "address your faxes" that week. Lincoln Deposition

11 Ex. 15. Lincoln notes that the next day, Carcione sent a

12 letter to Eggers stating that the latter had failed to reply

13 to the Demand Letter. Lincoln's Deposition Ex. 17. Despite

14 alleging never to have received the Demand Letter, there is

15 nothing to indicate that Eggers called or wrote to the Dias'

16 attorneys to say he had never received it. Indeed, neither of

17 the two subsequent letters sent by Eggers, on May 20, 2004 and

18 July 8, 2004, mentioned that Access had never received the

19 Demand Letter. Eggers Depo. at 101-105; Lincoln's Deposition

20 Ex. 16. Lincoln states that a reasonable juror could infer

21 from this that Eggers had received the demand letter, because

22 he otherwise would have indicated to Carcione that he had not

23 received it.

24      Access, however, has tendered evidence that it never

25 received the Diases' demand letter and therefore did not

26 breach the contract by failing to act on it. To support this,

Access cites the deposition of Tracy Eggers, who testified in his deposition that, "I can't remember seeing [the demand letter] any time before [the morning of May 8, 2008] and I can pretty much say I didn't see it before the 10th [of February, 2004] because it's not noted that there was a demand on the policy." Eggers Depo. at 96:1-9. Eggers testified that he also had no recollection of ever seeing the follow-up letters of January 30, 2004 prior to the morning of the deposition on May 8, 2008. Eggers Depo. at 96:15-97:11.

In addition, Access argues that the Diases' attorney "had no personal knowledge of the delivery of the demand letter or the follow-up correspondence [and] had no evidence Access Claims received the TLD or follow up correspondence," because the attorney himself had not faxed the letters. Def.'s Mot. Summ. J. at 11:24-12:1.

With the evidence provided by Lincoln and the deposition of Tracy Eggers tendered by Access, it is clear that there remains disputed facts as to whether the Demand Letter was received by Access. A reasonable factfinder could credit Eggers' testimony, that he did not receive the Demand Letter, and thus, this is fundamentally a question of credibility left to the factfinder. On the other hand, a reasonable jury could find that there is sufficient circumstantial evidence that Access did receive the January 20, 2004 and January 30, 2004 letters, including the fax confirmations, the fact that these letters were later seen in Access' file, and that Eggers

1   appeared unfazed by Carcione's reference to them in February
2   2004. Moreover, the fact that the Diases' attorney himself did
3   not fax the letters does not alone warrant a grant of summary
4   judgment in Access's favor; a reasonable jury could find that
5   the fax confirmations were adequate evidence of the faxes
6   having been sent.  The evidence tendered is sufficient to
7   permit a jury to draw reasonable inferences in Lincoln's
8   favor. See Matsushita, 475 U.S. at 587; Diebold, 369 U.S. at
9   655; Abramson, 594 F.2d at 208.

10                    **b.   Evidence of Damages**

11          Lincoln also has tendered evidence that this alleged
12   breach exposed Lincoln to "bad faith liability," constituting
13   damages for the breach of contract claim. In its relationship
14   to the insured, an insurer has a duty to accept a reasonable
15   settlement demand within the policy limits as part of the
16   covenant of good faith and fair dealing intrinsic to that
17   contractual relationship. Commercial Union Assur. Cos. v.
18   Safeway Stores, Inc., 26 Cal. 3d 912, 916-17 (1980); Comunale
19   v. Traders & Gen. Ins. Co., 50 Cal. 2d 654, 659 (1958).
20   Failure to do this risks subjecting the insurer to a "bad
21   faith" claim. Crisci v. Security Ins. Co., 66 Cal. 2d 425, 430
22   (1967); Comunale, 50 Cal. 2d at 659. Once the insurer's "bad
23   faith" has been established, the insurer must pay portions of
24   the judgment exceeding those expressed in the policy limits.[7]

25   _____

26          [7]Were the Diases to obtain a judgment against Coleman in
     excess of the policy limits, the Diases could then recover on

1  PPG Industries, Inc. v. Transamerica Ins. Co., 20 Cal. 4th

2  310, 315 (1999); Commercial Union, 26 Cal. 3d at 916-17.

3      Ignoring a policy-limits demand letter, without exploring

4  the details of the offer in any way, constitutes bad faith by

5  an insurer. Allen v. Allstate Ins. Co., 656 F.2d 487, 490 (9th

6  Cir. 1981) (applying California law). Even if the settlement

7  offer is unclear, an insurer may act in bad faith by failing

8  to seek clarification of the uncertainty. Betts v. Allstate

9  Ins. Co., 154 Cal. App. 3d 688, 708 (1984). Similarly, an

10  insurer may act in bad faith if it fails to investigate a

11  claim against the insured, so that it may evaluate the

12  reasonableness of a settlement offer. Id. at 707; Egan v.

13  Mutual of Omaha Ins. Co., 24 Cal.3d 809, 818 (1979).

14      Here, Lincoln has tendered evidence that would permit a

15  reasonable jury to find that Access's failure to timely

16  respond to the demand letter or at least seek clarification of

17  any uncertainty, exposed Lincoln to bad faith liability in

18  excess of the policy limits. As described above, Lincoln has

19  tendered evidence that the demand letter was sent to Access on

20  January 20, 2004 seeking a settlement totaling $30,000 and

21  requesting a response no later than January 30, 2004. Def.'s

22  SUF ¶¶ 10, 11. There is evidence that Access received these

23

24  Coleman's bad faith liability claim against Lincoln, by becoming
   a judgment-creditor and third-party beneficiary to Coleman's
25  insurance policy by operation of law. Hand v. Farmers Ins. Exch.,
   23 Cal. App. 4th 1847, 1858-59 (1994); Murphy v. Allstate Ins. Co.,
26  17 Cal. 3d 937, 942-44 (1976).

21

1   letters but did not respond to them. Lincoln has tendered

2   evidence that a reasonable insurer "would have recognized that

3   such letters [demand letter and follow-up letters of January

4   30, 2004] created the potential to open the policy limits

5   unless there was a timely and correct response." Lincoln's

6   Deposition Exhibit 250 (Report of Lincoln's Claims-Handling

7   Expert) In Support of Pl.'s Opp. to Def.'s Mot. for Summ. J.

8   at 11.

9        Access is incorrect in asserting that the law does not

10  support a finding of bad faith in such situation. The

11  California courts have been clear that bad faith liability

12  exists to induce an insurer to protect the insured's financial

13  interests with the same diligence as it would its own; the

14  insurer's conduct need not be grossly irresponsible or

15  unreasonable to trigger bad faith liability. See, e.g., Betts,

16  154 Cal. App. 3d at 707; Comunale, 50 Cal. 2d at 659. Given

17  this, a jury could reasonably find that if Lincoln's evidence

18  is credited, Access' action or inaction exposed Lincoln to bad

19  faith liability in excess of the policy limits.

20       Moreover, the court cannot agree with Access's

21  suggestion that the settlement demand was unreasonable as a

22  matter of law, because it was excessive for Diana Dias, it was

23  unsupported with the Diases' medical records, it did not

24  release liens for the medical bills or attorneys' fees, and

25  because it left no consideration for the claims of the Coleman

26  daughters. See Def.'s Mot. for Summ. J. at 27. The

reasonableness of a settlement offer is to be evaluated in

light of the victim's injuries and the probable liability of

the insured. Johnson v. Cal. State Auto Assn., 15 Cal. 3d 9,

16 (1975). Here, there is evidence that Diana Dias was left a

paraplegic by the accident, Def.'s SUF ¶ 7, and that Access

concluded that Coleman was 100 percent liable for the

accident. Eggers' Depo. 70:5-72:25. Access now asserts that

the demand was unreasonable because the Coleman policy was a

$15,000/$30,000 policy.  This contention fails in light of

Access's failure to respond at all, much less its failure to

seek clarification. See Betts, 154 Cal. App. 3d at 708.

Moreover, given the circumstances, it is likely that the

Diases would have argued the husband's loss of consortium,

thus satisfying the reasonableness of their demand.  These

facts alone could lead a jury to reasonably conclude that

Access's failure to respond to a settlement offer of $30,000

was unreasonable. Summary judgment is therefore inappropriate

as to this portion of the plaintiff's claim of breach of

contract.

> **2.   Access' Failure to Comply With Applicable Claims-**
>       **Handling Statues and Regulations**

Lincoln's second ground for its breach of contract claim

is its allegation that Access breached the Claims Agreement by

failing to handle the Dias claim in compliance with applicable

claims-handling statutes and regulations. See Compl. ¶ 21. The

Claims Agreement required Access to "[p]repare and file all

1  reports and handle all claims in accordance with established

2  claims procedures and state guidelines, assuring compliance

3  with the Fair Claims Practice Act, California Insurance Frauds

4  Prevention Act and all other applicable statutes and

5  regulations."[8] Claims Service Agreement at 1, ¶ 2.

6         **a.   Violation of California Regulations**

7      Lincoln alleges first that Access violated the California

8  Insurance Regulations, thereby violating the contract.

9  Specifically, Lincoln alleges that Access failed to comply

10  with the following regulation:

> Upon receiving any communication from a claimant,
> regarding a claim, that reasonably suggests that a
> response is expected, every licensee shall
> immediately, but in no event more than fifteen (15)
> calendar days after receipt of that communication,
> furnish the claimant with a complete response based
> on the facts as then known by the licensee.

15  10 CCR § 2695.5(b)(2005). Lincoln asserts that Access violated

16  this regulation by not responding to the Diases' demand letter

17  within fifteen days of its receipt. As described above,

18  Lincoln has tendered sufficient evidence that Access received

19  the demand letter and failed to respond to it. Nevertheless,

20  Lincoln has not shown how Access's failure to respond to it

21  within fifteen calendar days caused any damages to Lincoln.

22  Lincoln's theory of the case is that the policy limits were

23  _____

24       [8]Although elsewhere in its briefing, Access argues that the
choice of law provision in the contract requires application of
25  Pennsylvania law, it does not argue that relevant California
statutory and regulatory requirements were not integrated into the
26  contract via this provision.

1  opened by Access's failure to respond to the demand letter

2  within ten days, as set forth in the letter; as such, Access's

3  violation of the deadlines set forth by this regulation did

4  not cause the harm that Lincoln purports to have suffered.

5  Consequently, defendant's motion is granted as to this aspect

6  of Lincoln's cause of action.[9]

7              **b.   Violation of Insurance Code**

8       Lincoln also alleges that Access violated California's

9  statute barring unfair methods of competition and unfair and

10  deceptive acts or practices in the business of insurance,

11  specifically by,

12              (h) Knowingly committing or performing with
                such frequency as to indicate a general
13              business practice any of the following unfair
                claims settlement practices: . . .
14              (5) Not attempting in good faith to effectuate
                prompt, fair, and equitable settlements of
15              claims in which liability has become reasonably
                clear.

16

17  CAL. INS. CODE § 790.03. Lincoln alleges that after Access had

18  determined that Coleman (the insured's) liability to the

19  Diases had become reasonably clear, Access, as Lincoln's

20  agent, failed to effectuate in good faith a prompt, fair, and

21  reasonable settlement.

22       Access first argues that Lincoln's reliance on this

23  statute is inappropriate, as the statute does not authorize a

24  ─────────────────

25       [9]Of course, if Access were to assert that the ten day demand
    was unreasonable, the fifteen days required by the regulation would
26  become relevant.  Access has not made such a claim.

                                25

1   private right of action. <u>See</u> <u>Tricor Cal., Inc. v. Sup. Ct. Los</u>

2   <u>Angeles County</u>, 220 Cal. App. 880 (1990). This argument is

3   unpersuasive.   Lincoln has not brought a cause of action under

4   the statute but rather alleges that the statute's requirements

5   were integrated into the contract and that, by violating them,

6   Access breached the contract. This is a viable theory to

7   support a breach of contract cause of action. <u>See</u>, <u>e.g.</u>,

8   <u>Moradi-Shalal v. Fireman's Fund Ins. Cos.</u>, 46 Cal. 3d 287,

9   304-305 (1988).

10      Access also argues that Lincoln cannot show that Access

11  violated the statute. The court disagrees. Lincoln has

12  tendered evidence that would permit a reasonable jury to

13  conclude that Access had determined that Coleman was

14  "reasonably clear[ly]" liable to the Diases and that Access

15  did not act in good faith to effectuate a "prompt, fair, and

16  equitable settlement." <u>See</u> CAL. INS. CODE § 790.03(h)(5). The

17  notes of Access's claims representative, Tracey Eggers,

18  indicate that he concluded that Coleman was 100 percent at

19  fault for the accident. Eggers Depo. at 70:5-72:25. Although

20  Access argues that Eggers' testimony is equivocal in this

21  regard, it is undisputed that the notation "Named insured is

22  100 percent liable for all damages in accident" appeared in

23  Eggers' notes in the claim file. <u>Id.</u> at 70:9-16. A jury could

24  reasonably conclude that this is adequate evidence that Access

25  had determined that it was reasonably clear that Coleman was

26  liable for the accident. Additionally, as explained above, a

1 reasonable jury could also conclude that Access acted

2 improperly by failing to respond to the Diases' demand letter

3 and, in so doing, obviated Lincoln's opportunity to settle the

4 claim "prompt[ly], fair[ly], and equitabl[y]." See CAL. INS.

5 CODE § 790.03(h)(5).

6     In sum, as Lincoln's agent in the claims handling

7 process, Access was responsible for addressing the Dias

8 settlement proposal on behalf of Lincoln. See Claims Service

9 Agreement at 1 ¶ 1. Lincoln has tendered evidence that

10 Access's conduct was such that a reasonable jury could

11 conclude it violated Insurance Code § 790.03, thereby

12 violating the terms of the contract. As discussed above,

13 Lincoln has also tendered evidence that this mishandling

14 caused its damages. Access's motion is therefore denied as to

15 this aspect of Lincoln's breach of contract claim.

16     **c.   Violation of "Established Claims Procedures"**

17     Finally, Lincoln has alleged that Access violated

18 "established claims procedures" in its handling of the Dias

19 settlement demand. It appears that the contract did not set

20 forth claims procedures distinct from those established by

21 regulation and statute. See Claims Service Agreement at 1 ¶ 2;

22 2 ¶ 17; Appendix B. Although the Claims Services Agreement

23 purported to integrate practices and procedures set forth in

24 an "Administrator's Claim Manual," it appears that that manual

25 was never included in the contract, perhaps unintentionally.

26 See Claims Service Agreement 2 ¶ 17, App. B. Because there is

27

1  no evidence tendered to the court as to what additional claims
2  procedures the contract required of Access apart from those
3  set by California law, the court grants defendant's motion to
4  the extent that plaintiff's breach of contract claim relies on
5  an allegation that Access failed to comply with such
6  additional claims procedures.

7  **B.    Breach of Covenant of Good Faith and Fair Dealing**

8       There is implied in every contract a covenant of good
9  faith and fair dealing that neither party will act in a way to
10 compromise the rights of the other to receive the benefits of
11 the contract. Merritt v. J. A. Stafford Co., 68 Cal. 2d 619
12 (1968); Brown v. Superior Court of Los Angeles County, 34 Cal.
13 2d 59, 564 (1949). The covenant imposes on each party not only
14 the duty to avoid acting in a way that compromises the
15 performance of the contract, but also the duty to do
16 everything that the contract assumes they will do to bring
17 about its purpose. Harm v. Frasher, 181 Cal. App. 2d 405, 417
18 (1960). The covenant exists to protect the "purposes and
19 express terms of the contract" and not a general public policy
20 interest unrelated to the agreement. Foley v. Interactive Data
21 Corp., 47 Cal.3d 654, 690 (1988).

22      Though there appears to be a split of authority, the
23 majority of courts hold that a breach of the covenant occurs
24 when a party engages in objectively unreasonable conduct,
25 "regardless of the actor's motive." Carma Developers (Cal.),
26 Inc. v. Marathon Development California, Inc., 2 Cal. 4th 342,

28

1 373 (1992); see also Neal v. Farmers Ins. Exchange, 21 Cal. 3d
2 910, 922 n. 5 (1978); Badie v. Bank of America, 67 Cal.
3 App.4th 779, 796 (1998); Lazar v. Hertz Corp., 143 Cal. App.
4 3d 128, 141 (1983). Deliberately dishonest conduct is not
5 required for the covenant to be breached, nor is it required
6 that a specific term of the contract be breached. Carma
7 Developers, 2 Cal.4th at 373.

8     Additionally, "bad faith may be overt or may consist of
9 inaction, and fair dealing may require more than honesty."
10 R.J. Kuhl Corporation v. John L. Sullivan, 13 Cal. App. 4th
11 1589, 1602 (1993), citing Rest. 2d Contracts § 205, com. d. In
12 R.J. Kuhl, a real estate brokerage sued their client and a
13 third party buyer for breach of contract due to failure to pay
14 a commission. Id. The buyer had engaged in a side real estate
15 transaction with a third party which resulted in him gaining
16 an unfair economic advantage. Id. The trial court ruled in
17 favor of the brokerage, and the appeals court affirmed,
18 holding that the client's obligation to pay the commission was
19 subject to the covenant of good faith and fair dealing. Id. at
20 1593. The appeals court noted the following examples of bad
21 faith that have been recognized by the courts: "evasion of the
22 spirit of the bargain, lack of diligence and slacking off,
23 willful rendering of imperfect performance, abuse of a power
24 to specify terms, and interference with or failure to
25 cooperate in the other party's performance." Id. at 1602. The
26 court held that although the defendant honestly believed he

1  was permitted to avoid paying commission to his broker, it was

2  objectively unreasonable conduct, thereby breaching the

3  covenant. Id. at 1604.

4      Access argues that other courts have held that a breach

5  of the good faith covenant requires scienter:

6          [that]... demonstrates a failure or refusal to
           discharge contractual responsibilities, prompted not
7          by an honest mistake, but rather by a conscious and
           deliberate act, which unfairly frustrates the agreed
8          common purposes and disappoints the reasonable
           expectations of the other party...
9

10 Careau & Co. v. Security Pacific Business Credit, Inc., 222

11 Cal. App. 3d 1371, 1395 (1990). This rule has been followed by

12 some federal district courts. See Houque v. City of Holtville,

13 2008 WL 1925249 at *4 (S.D. Cal. Apr. 30, 2008); Nava v.

14 Virtualbank, 2008 WL 2873406 (E.D. Cal. July 16, 2008).

15 However, it appears to be the minority position in California

16 and is contradicted by the California Supreme Court's

17 holdings. See Carma Developers, 2 Cal. 4th at 373 ("Nor is it

18 necessary that the party's conduct be dishonest. . . . the

19 covenant of good faith can be breached for objectively

20 unreasonable conduct, regardless of the actor's motive."); 

21 Neal, 21 Cal. 3d at 922 n. 5 ("The terms 'good faith' and 'bad

22 faith' as used in this context . . . are not meant to connote

23 the absence or presence of positive misconduct of a malicious

24 or immoral nature."). The court therefore declines to follow

25 the Careau court.

26 ////

1    Plaintiff alleges nine instances of breach of the

2  covenant of good faith and fair dealing:

       a) failing to timely and properly respond to Ms.
       Dias' policy limit demand letter;
       b) failing to request an extension of time to
       properly respond to Ms. Dias' policy limit demand
       letter;
       c) failing to institute and establish adequate
       policies and procedures to ensure proper response to
       policy limit demands when claim handlers were sick
       on leave;
       d) failing to properly instruct and supervise claim
       handlers in the proper steps to take in such
       circumstances;
       e) failing to notify Lincoln General of the Dias
       claim even though Access considered the claim to
       encompass high exposure;
       f) failing to pay the policy limits into the
       appropriate Court;
       g) failing to notify Lincoln General immediately
       upon learning that Ms. Dias' counsel intended to
       proceed with negotiations without regard to the
       policy limits;
       h) failing to obtain legal counsel to adequately
       represent the interests of Lincoln General;
       i) failing to secure a court decision regarding the
       legal efficiency of Ms. Dias' alleged demand beyond
       the policy limits.

17 Compl. ¶ 27. In its opposition to defendant's motion, Lincoln

18 condenses these nine alleged breaches into two general

19 categories: Access' failure to act with diligence in its

20 discretionary power to handle claims by (1) failing to report

21 to Lincoln that its conduct exposed Lincoln to bad-faith

22 liability;  and (2) respond to the demand letter or otherwise

23 handle the Dias Claim appropriately. Pl.'s Opp'n to Mot. for

24 Summ. J. at 20-23. The court considers each of these in turn.

25 ////

26 ////

31

1          **1.    Access' Failure to Inform Lincoln that Access**

2                  **Exposed Lincoln to Bad-Faith Liability**

3          Lincoln contends that if Access's failure to respond to

4    the demand letter is found to not have breached a term of the

5    contract, Access nevertheless breached the covenant of good

6    faith and fair dealing by failing to inform Lincoln that

7    Access's conduct may have exposed Lincoln to bad faith

8    liability.

9          Access responds to this with several arguments. First, it

10   argues that the evidence is insufficient to permit a

11   reasonable fact-finder to conclude that Access received the

12   demand letter. As explained above, there is adequate evidence

13   tendered to permit this conclusion.

14         Second, Access asserts that its reporting duties, as

15   outlined in the Claims Agreement § 1 and Appendix A to the

16   Agreement, do not require Access to disclose to Lincoln

17   allegations of bad faith claims handling. This is

18   unpersuasive, as the covenant of good faith and fair dealing

19   encompasses discretion vested in a party beyond that which is

20   expressly dilineated by the contract's terms. The California

21   courts have rejected an interpretation of the covenant that

22   would limit it to breaches of the contract itself. See Harm,

23   181 Cal. App. 2d at 417. Here, the contract vested Access with

24   the responsibility, broadly, to handle claims against Lincoln

25   and investigate the latter's liability with regard to claims.

26   Claims Service Agreement at 1 ¶ 1. The  purpose of this

                                   32

1  arrangement was for Access to act in a manner that fairly
2  limited Lincoln's exposure to liability. By failing to inform
3  Lincoln that Access had received but not timely responded to a
4  request for settlement of the Dias' claim, a jury could
5  reasonably find that Access acted in a way that impeded
6  Lincoln's purpose in entering the contract, notwithstanding
7  that there was not an explicit reporting requirement contained
8  in the contract.

9      Third, Access argues essentially that it was Lincoln's
10  own lack of diligence that caused any damages it suffered,
11  because Lincoln had "full and frequent access to information
12  regarding all claims, including the Dias claim" per the Claims
13  Service Agreement. Mot. for Summ. J. at 16. This appears to
14  the court to be an argument of comparative fault, which would
15  not bar plaintiff's recovery for defendant's breach of the
16  covenant. See Li v. Yellow Cab Co., 13 Cal. 3d 804, 828-29
17  (1975). Regardless, Lincoln has tendered unrefuted evidence
18  that the purpose of the audit was not to inform itself of
19  particular development in specific cases, but to "review best
20  practices [and] . . . trends." Kirk Depo. at 67:5-20. In this
21  light, a reasonable factfinder could conclude that Access's
22  failure to inform Lincoln of its non-response to the demand
23  letter caused Lincoln's damages, notwithstanding Lincoln's
24  authority to audit the file.

25      Finally, Access argues that it did not cause any of
26  Lincoln's damages because Lincoln knew of the Dias claim three

months before the Dias trial and failed to take any action,
such as filing for declaratory judgment or an interpleader
action, in the Dias suit. Though Lincoln does not contest the
fact that it knew about the Dias claim at least three months
before the start of trial, it argues that an interpleader or
declaratory relief could not have been filed and completed in
that time. Lincoln argues if they had been told about the Dias
claim at an earlier date, not only could they have filed
appropriate litigation, but they also would have been able to
better evaluate whether to involve themselves in the Diases'
subsequent products liability lawsuit.

Like the defendant's previous argument, this does not
appear to present a complete defense to Access's potential
breach of the covenant of good faith and fair dealing. Even if
a jury were to find that Lincoln was remiss in not filing an
interpleader action or for declaratory relief, there is no
certainty that either of these efforts would have been
successful. Moreover, as Lincoln observes, even if Lincoln
filed an interpleader action, it still was exposed to
liability in excess of the policy limits and  would still have
had to defend Coleman in the Dias suit. See Mt. Hawley Ins.
Co. v. Fed. Sav. & Loan Ins. Corp., 695 F. Supp. 469, 474
(C.D. Cal. 1987).

Defendant's motion for summary judgment is therefore
denied as to plaintiff's claim for breach of the covenant of
good faith and fair dealing to the extent described above.

1      **2.    Access' Failure to Handle the Dias Claim**

2             **Appropriately**

3      The Claims Service Agreement established a relationship

4 between Access and Lincoln by which the former was responsible

5 for handling all claims against the latter for the implied

6 purpose of limiting Lincoln's liability. As explained in the

7 previous section, Access's failure to respond to the demand

8 letter could be found to violate the covenant of good faith

9 and fair dealing, as doing so exposed Lincoln to excess

10 liability, undermining Lincoln's very interest in entering the

11 contract.

12      Moreover, Lincoln has tendered evidence that Access

13 mishandled the Dias claim in other ways.  Lincoln's claims-

14 handling expert described the condition of the Dias file up

15 until January of 2004, when the Demand Letter wa sallegedly

16 sent to Access:

17          We are not 10 months into the claim and no real
           investigation has been done and no one at Access
18          demonstrates an awareness of this or a concern that
           they have a liability case involving a negligence free
19          passenger in the other vehicle who was made a
           paraplegic in the accident at issue.  This is totally
20          unacceptable conduct and fails to conform to Industry
           Custom and Practice and for the Standard of Care to
21          which Mr. Coleman and Lincoln are entitled to expect.

22 Lincoln's Depo. Ex. 250 at 9.  There is evidence in the record

23 that the Dias' attorney tried to contact Eggers on numerous

24 occasions and his correspondence was not replied to.

25 Lincoln's Deposition Exhibits 9, 10, 11 In Support of Pl.'s

26 Opp'n to Def.'s Mot. for Summ. J.; Dolinski Depo. at 15:6-

21:14.  Were a jury to credit this evidence, it could
reasonably find that it constituted a breach of the covenant
of good faith and fair dealing.  See R.J. Kuhl, 13 Cal. App.
4th at 1602 (breach of the covenant includes "lack of
diligence and slacking off").

In sum, Lincoln has presented evidence that would permit
a jury to reasonably conclude that Access breached the
covenant of good faith and fair dealing by its poor handling
of the Dias claim and it failure to inform Lincoln of its
potential exposure as a result.  For this reason, Access'
motion for summary judgment on the breach of the implied
covenant of good faith and fair dealing claim is denied.

**C.   Fraudulent Concealment**

In its final cause of action, Lincoln alleges that Access
fraudulently failed to disclose the following from Lincoln: 1)
that Access had not timely responded to the demand letter or
sought an extension and that the Diases consequently sought a
settlement in excess of the policy limits; 2) that it did not
have adequate procedures when a claims handler was out sick;
3) that the Diases had made a claim against Lincoln and that
Access had not set a "proper" reserve amount for the claim; 4)
that it had not paid policy limits "to the appropriate court"
nor secured "a court decision regarding the legal efficiency
of Ms. Dias'" claim; and 5) that it did not retain counsel to
adequately represent Lincoln's interests.
////

36

1    In order to succeed on a claim for fraud, the plaintiff

2  must show "(a) misrepresentation (false representation,

3  concealment or nondisclosure); (b) knowledge of falsity (or

4  'scienter'); (c) intent to defraud, i.e., to induce reliance;

5  (d) justifiable reliance, and (e) resulting damages." <u>Agosta</u>

6  <u>v. Astor</u>, 120 Cal. App. 4th 596, 603 (2004).[10]

7  Access challenges the viability of Lincoln's claim on several

8  grounds, which the court considers in turn.[11]

9    First, Access argues that there is insufficient evidence

10 that the demand letter was received.  As explained above, the

11 evidence tendered is sufficient to create a genuine issue of

12 material fact on this issue.

13   Second, Access takes issue with Lincoln's allegation that

14 Access concealed from Lincoln that it had failed "to establish

15 a proper reserve even though Access considered the (Dias)

16 claim to encompass high exposure." Compl. ¶ 37(e).  Access

17

18  _____

19    [10]Access raises for the first time in its reply brief on the
   argument that Pennsylvania law applies to Lincoln's claim for
20 fraudulent concealment.  It is not proper for the court to consider
   new arguments raised in a reply. <u>Von Brimer v. Whirlpool Corp.</u>, 536
21 F.2d 838, 846 (9th Cir. 1976).  Furthermore, the court held in its
   August 29, 2007 order that California substantive law applies to
22 all disputes arising out of Lincoln's and Access's relationship,
   with the narrow exception of questions of the interpretation or
23 construction of their contract.

24    [11]In its reply brief, Access raised for the first time the
   arguments that there is no evidence of intentional concealment or
25 actual reliance.  Again, it is improper for the court to rely on
   arguments that were not timely raised.  <u>Von Brimer</u>, 536 F.2d at
26 846.

37

1  argues that it had no authority to set the reserve values

2  above the policy limits.

3       A reserve is a sum of money set aside to pay a claim,

4  with the purpose of guarding against insurer insolvency.  The

5  Supreme Court has explained,

6           The term "reserve" or "reserves" has a special meaning
           in the law of insurance.  While its scope varies under
7           different laws, in general it means a sum of money,
           variously computed or estimated, which, with accretions
8           from interest, is set aside -- "reserved" -- as a fund
           with which to mature or liquidate, either by payment or
9           reinsurance with other companies, future unaccrued and
           contingent claims, and claims accrued, but contingent
10          and indefinite as to amount or time of payment.

11 Maryland Casualty Co. v. United States, 251 U.S. 342, 350

12 (1920).  The reserve value, therefore, should accurately

13 reflect the insurer's potential loss on a claim.  See, e.g.,

14 Shade Foods, Inc. v. Innovative Product Sales and Marketing,

15 Inc., 78 Cal. App. 4th 847, 883 (2000).

16      Here, Access argues that it had no authority to set the

17 reserve on the Dias claim at a value greater than the policy

18 limits.  See Claims Service Agreement at 1 ¶ 5 ("The

19 Administrator shall . . . [e]stablish initial reserves and

20 adjust them accordingly for potential exposure, considering

21 value and liability. . . . The Administrator will have no . .

22 . reserve authority in excess of the limit of liability on the

23 insurance policy which is triggered by the claim.").  This

24 apparently misunderstands Lincoln's theory of the claim, which

25 is that Access set the reserves lower than the policy limits,

26 for the purpose of concealing Lincoln's potential exposure for

1  the claim and, allegedly, Access's claim mishandling. See

2  Eggers Depo. at 89:10-90:22 (claims file reflects that someone

3  set the reserve at lower than the $30,000 policy limit, after

4  Eggers had set it at $30,000).  The evidence tendered suffices

5  to create a genuine issue of material fact on this issue.

6      Third, Access contends that even if it did mishandle the

7  Dias claim, it had no duty to disclose this to Lincoln and

8  therefore cannot be liable for fraudulent concealment.  Under

9  California law, a defendant can only be liable for fraudulent

10 concealment where it had a legal duty to disclose the

11 concealed fact. Buckland v. Threshhold Enter, Ltd., 155 Cal.

12 App. 4th 798, 807 (2007); Lingsch v. Savage, 213 Cal. App. 2d

13 729, 735 (1963). Access, however, had a statutory duty to send

14 a copy of the claims file to Lincoln as soon as it was aware

15 that the claim had the potential to exceed the policy limits.

16 Cal. Ins. Code § 769.83(g).  This statutory duty was expressly

17 integrated into the Claims Service Agreement.[12]  Claims Service

18 Agreement at 2 ¶ 19.  Consequently, as a matter of law, Access

19 had a duty to disclose the Dias claim to Lincoln and, as soon

20 as it was aware of Lincoln's potential bad faith liability, to

21 forward a copy of the claim file, which would alert Lincoln as

22  _____

23      [12]Despite Access's characterization to the contrary, neither
    the deposition of Timothy Kirk nor his e-mail correspondence to
24  Access (Depo. Ex. 54) suggest that Insurance Code § 769.83(g)'s
    reporting requirements were not integrated into the contract.  On
25  the contrary, the evidence Access cites indicated Mr. Kirk's
    displeasure with Access that this reporting had not been done. See
26  Kirk Depo. vol. 1 54:3-17, 63:4-64:6; Depo. Ex. 54 at 2-3.

1  to Access's handling of the claim.  Access' motion therefore

2  fails in this regard.

3       Fourth, Access argues that if it mishandled the Dias

4  claim, it did not have a separate duty to disclose this to

5  Lincoln, as there is no legal duty for an actor to disclose

6  its intentional tort.  See LiMandri v. Judkins, 52 Cal. App.

7  4th 326, 339 (1997) (holding that the same conduct could not

8  be a basis for both a claim for intentional interference with

9  prospective economic advantage and intentional interference

10 with contract).  This seems entirely innapplicable to the

11 instant case.  Lincoln's fraudulent concealment claim does not

12 allege that Access improperly failed to disclose that it

13 intended to commit a tort, but that, *inter alia*, it failed to

14 disclose its inadequate claims handling procedures and its

15 mismanagement of the Dias claim.  Access' argument is

16 therefore unavailing.

17      Fifth, Access argues that Lincoln became aware of the

18 Dias claim in January 2005 and could have filed an

19 interpleader action or for a declaratory judgment prior to

20 trial.  As explained above, this may be true but offers no

21 grounds on which to grant summary judgment in Access' favor.

22      Finally, Access asserts that Lincoln's claim must fail to

23 the extent that it alleges that Access failed to obtain legal

24 counsel to represent Lincoln's interests.  See Compl. ¶ 37(h);

25 Claims Service Agreement at 1 ¶ 4 ("The Administrator shall .

26 . . coordinate, direct and manage litigation activity,

40

1  assigning defense to approved legal counsel subject to

2  Client's control.") The undisputed evidence establishes that

3  Access did obtain legal counsel for Lincoln.  Def.'s SUF ¶¶

4  40-43.  There is also evidence that Lincoln was not displeased

5  with the representation provided by counsel obtained through

6  Access. See Kirk Depo. vol. 2 at 233, 237.  Lincoln's theory

7  instead appears to be that Access fraudulently concealed the

8  fact that it had obtained inadequate counsel for Lincoln.

9  Lincoln rests this theory on its contention that Access's

10  delay in notifying Lincoln of its exposure in the Dias suit

11  inhibited Lincoln from "evaluat[ing] the case against [other]

12  defendants and pursu[ing] other options." Pl.'s Opp'n to

13  Def.'s Mot. for Summ. J. at 25.  This is not evidence of the

14  inadequacy of the counsel obtained by Access for Lincoln, but

15  rather relates to Lincoln's allegation of Access' underlying

16  mismanagement of the Dias claim and the alleged effect it had

17  on Lincoln's litigation position with regards to that claim.

18  Access' motion is therefore granted on subpart (g) of

19  Lincoln's claim of fraudulent concealment.

20  **D.    Effect of Lincoln's Settlement, Rather Than Adjudication**

21       **of Liability, on Access's Obligation to Indemnify**

22       Access argues that Lincoln cannot recover against it

23  ////

24  ////

25  ////

26  ////

on any of its causes of action because a party that settles
cannot later seek indemnification, since there has been no
determination of legal liability.[13]   The court disagrees.

California has long applied the rule that when there is
an agreement to indemnify for liability, the party seeking
indemnification need not wait for judgment against it, but may
be indemnified for payments made in satisfaction of a
settlement. <u>See</u> <u>Mabie & Mintz v. B & E. Installers</u>, 25 Cal.
App. 3d 491 (1972); <u>Pac. Tel & Tel. Co. v. Pac. Gas & Elec.</u>
<u>Co.</u>, 170 Cal. App. 2d 387 (1959); <u>cf.</u> <u>Crawford v. Weather</u>
<u>Shield Mfg., Inc.</u>, 44 Cal. 4th 541, 559 (2008) ("One can only
indemnify against 'claims for damages' that have been resolved
against the indemnities, i.e., those as to which the
indemnitee has actually sustained liability *or* paid damages."
(emphasis added)).   In order to be indemnified, "[w]hen the
indemnitee settles without trial, the indemnitee must show the
liability is covered by the contract, that liability existed,
and the extent thereof." <u>Mel Clayton Ford v. Ford Motor Co.</u>
104 Cal. App. 4th 46, 54 (2002) (citing <u>Peter Cully & Assoc.</u>
<u>v. Sup. Court</u>, 10 Cal. App. 4th 1484 (1992)).   The settlement
amount constitutes a "volunteer" payment only when the

---

[13]Access contends that this is true under both California and
Pennsylvania law, although urges the court to apply the latter.
In its August 29, 2007 order, the court determined that
Pennsylvania law only applies to the interpretation or construction
of the contract's terms, but not to any other dispute arising out
of the parties' relationship.   Order, Aug. 27, 2007, at 12-15.
California law regarding indemnification therefore applies here.

1 indemnitor shows that the indemnitee unreasonably paid too

2 much in the settlement, id. at 58; see also  Pac. Tel. & Tel.,

3 170 Cal. App. 2d at 392, or otherwise entered into the

4 settlement in bad faith.[14]   Peter Cully & Assoc., 10 Cal. App.

5 4th at 1497 ("The settlement is presumptive evidence of

6 liability of the indemnities and of the amount of liability,

7 but it may be overcome by proof from the indemnitor that the

8 settlement was unreasonable (e.g., unreasonable in amount,

9 entered collusively or in bad faith, or entered by an

10 indemnitee not reasonable in the belief that he or she had an

11 interest to protect).").  The court declines to follow New

12 Hampshire Indemnity Co. v. Professional Claim Services, Inc.,

13 No. D051230, 2008 WL 5115084 (Cal. Ct. App. Dec. 5, 2008), to

14 the extent it reached a contrary holding, as its holding

15 appears inconsistent with the great weight of authority of the

16 California courts and, in any event, according to the

17 California Rules of Court is not intended to carry

18 precedential force. See Cal. Rule of Court 8.1115.

19      Access misconstrues the holding of Safeco Ins. Co. v.

20 Superior Court, 71 Cal. App. 4th 782 (1999), in its attempt to

21

22      [14]Access' argument that Lincoln's payment was voluntary to the
extent that it exceeded the difference between the Diases'
23 settlement demand and the amount the Diases later received from the
defendants to the Diases' product liability suit holds no force.
24 Lincoln's settlement with the Diases occurred in May 2005 whereas
the defendants to the other suits settled in November 2005 and
25 February 2007. See Access' Deposition Exh. B-C.  Although the
amount of these settlements may be evidence of the reasonableness
26 of Lincoln's settlement, it does not establish the unreasonableness
of the settlement value as a matter of law.

43

1  convince the court that there must be a judgment entered

2  against the indemnitee before indemnification can be sought.

3  In Safeco, the court confronted a claim by an insured against

4  its insurer for refusal to settle his claim. Id. at 788-89.

5  The court held that if an insurance company refuses to settle,

6  the insured (or the party to whom the insured has assigned his

7  rights) may only bring an action for bad faith refusal to

8  settle after a judgment has been rendered in excess of the

9  policy limits. Id. The court explained that this is based on

10  the logic that if the insurer refuses to settle and then

11  secures a judgment below the settlement offer, the insured has

12  no claim for "bad faith." Id. This holding has no bearing on

13  the case at bar, where Lincoln is not alleged to have refused

14  in bad faith to settle Coleman's claim, and it certainly does

15  not stand for the broad proposition that an "insured being

16  provided a defense does not have a bad faith claim prior to

17  excess judgment," as Access purports. See Def.'s Brief In

18  Support of Mot. for Summ. J. at 29-30.

19       In its reply brief, Access also argues that Lincoln

20  cannot seek indemnity for settling the Dias claim, because the

21  Dias claim was brought against Coleman, not Lincoln.  As such,

22  Access argues, there is no evidence of Lincoln's liability to

23  the Diases, sufficient to trigger Lincoln's duty to settle.

24  Even assuming this argument was timely raised, it is wholly

25  unpersuasive.  Lincoln was not a mere bystander in the action

26  brought by the Diases against Lincoln's insured.  As explained

44

1  supra, Lincoln would be liable for at least some portion of
2  the judgment obtained against Coleman, particularly where the
3  mishandling of the Diases' settlement offer had opened the
4  policy limits. See Traveler's Cas. & Sur. Co. v. Sup. Court,
5  126 Cal. App. 4th 1131 (2005).  Moreover, as Coleman's
6  insurer, Lincoln had a legal duty to make a reasonable effort
7  to settle the Diases' claim against him. See e.g., Lehto v.
8  Allstate Ins. Co., 31 Cal. App. 4th 60, 67-68 (1994) ("the
9  implied obligation of good faith and fair dealing requires the
10 insurer to settle in an appropriate case although the express
11 terms of the policy do not impose such a duty" (citation
12 omitted)); Cancino v. Farmers Ins. Group, 80 Cal. App. 3d 335,
13 340 (1978) (as part of the covenant of good faith and fair
14 dealing with the insured, an insurer must make a good faith
15 effort to settle a claim against the insured within the policy
16 limits).  In other words, to the extent that Access is arguing
17 that Lincoln's settlement was unreasonable because it did not
18 have a legal interest to protect, see Peter Cully & Assoc., 10
19 Cal. App. 4th at 1497, Access is plainly wrong.
20      Indemnification is also triggered when the indemnitor
21 failed to discharge its duty to provide a defense to the
22 indemnitees.  Although Access attempts to draw a distinction
23 between an indemnitor's duty to indemnify and its duty to
24 defend the indemnitee, California law conceives of these
25 duties as intimately related.  By statute, a contractual
26 promise to indemnify includes the promise to reimburse the

1  indemnitee for the costs of its defense. Cal. Civ. Code §

2  2778(3).  Furthermore, when the indemnitee requests it, the

3  indemnitor must provide the defense. Id. § 2778(4).  The

4  indemnitor's refusal to do so is conclusive in an

5  indemnification action against it. Id. § 2778(5); see also

6  Crawford, 44 Cal. 4th at 555-57; Pac. Tel. & Tel., 170 Cal.

7  App. 2d at 392.  In that situation, the settling party is

8  entitled to indemnification, so long as it has made a good

9  faith settlement. Pac. Tel. & Tel., 170 Cal. App. 2d at 392.

10  In contrast, if the indemnitor offers a defense but is not

11  allowed by the indemnitee to control the defense, this is not

12  a bar to the latter's indemnification. See Cal. Civ. Code §

13  2778(6).

14      Here, the contract between Lincoln and Access contained

15  an indemnification provision by which each party agreed to

16  indemnify the other for "all claims, loss, liability, costs,

17  damages and reasonable attorney's fees incurred . . . as the

18  direct or indirect result of any misconduct, instructions,

19  error or omission of the other . . . ." Claims Service

20  Agreement at 3, Section III.  The contract also provided that

21  Access would "coordinate, direct and manage litigation

22  activity" and "negotiate claims through settlement." Id. at 1

23  ¶¶ 1, 4.

24      As explained thoroughly supra, Lincoln has tendered

25  evidence that through the handling of the Dias claim, Lincoln

26  was exposed to liability in excess of the Coleman policy

1  limits.  It is also undisputed that Access determined Coleman

2  to be 100 percent at fault for the Diases' damages.  In light

3  of this evidence, Access has not borne its burden to show that

4  the settlement into which Lincoln entered was unreasonable or

5  otherwise in bad faith. See Pac. Tel. & Tel., 170 Cal. App. 2d

6  at 392; Peter Cully & Assoc., 10 Cal. App. 4th at 1497; see

7  also 39A California Jurisprudence 3d § 543 (question of

8  reasonableness of an insurer's settlement is typically a

9  question of fact best entrusted to a jury, collecting cases).

10      Additionally, there is evidence that Access did not

11  discharge its duty to Lincoln to provide a defense to the Dias

12  suit.  The evidence is equivocal in this regard, but certainly

13  sufficient to defeat Access's motion.  On one hand, as

14  described supra, Access did provide Lincoln legal counsel for

15  Lincoln and Lincoln was not displeased with the representation

16  provided by counsel obtained through Access.  See Def.'s SUF

17  ¶¶ 40-43; Kirk Depo. vol. 2 at 233, 237.  There is also some

18  evidence that Lincoln barred Access from participating in

19  portions of the settlement negotiations.  Kirk Depo. vol. 2 at

20  245:6-17.  On the other hand, Lincoln has tendered evidence

21  that Access participated in only a limited fashion in the

22  settlement negotiations. See Morris Depo. at 51:4-16; Kirk

23  Depo. vol. 1 at 94:19-95:24; Kirk Depo. vol. 2 at 245:6-17;

24  Burnham Depo. at 182:8-22.  A factfinder could thus reasonably

25  conclude that Access did not discharge its duty to provide a

26  defense to Lincoln when requested, and therefore that Lincoln

1  is entitled to indemnification so long as its settlement was

2  reasonable. <u>See</u> Cal. Civ. Code § 2778.

3  **E.    Lincoln's Reimbursement for Its Losses**

4       Finally, Access contends that Lincoln has been reimbursed

5  for its losses related to the Dias claim and therefore cannot

6  recover against Access.  The court does not agree.

7       **1.    Lincoln's Reinsurance Agreements**

8       The parties do not dispute that Lincoln's reinsurers

9  possess subrogation rights in a recovery against Access, and

10 that these rights exist both by operation of law and expressly

11 through Lincoln's contracts with its reinsurers. <u>See</u>

12 <u>Progressive West Ins. Co. v. Sup. Court</u>, 135 Cal. App. 4th

13 263, 272 (2005).  It is also undisputed that Lincoln has been

14 reimbursed via its reinsurance agreements for a total of

15 $2,388,000.  It seeks damages for this amount (and more, since

16 it seeks to recover the entire $3,800,000 settlement and other

17 damages), but Lincoln claims that this would not constitute

18 double recovery because the $2,388,000 will be repaid to the

19 reinsurers.  The dispositive issue, therefore, is whether

20 Lincoln has the right to sue in its own name for the purpose

21 of enforcing its reinsurers subrogation rights.

22      California courts have held that a party that has been

23 fully compensated may nevertheless seek recovery from the

24 responsible party if it does so to enforce an insurer's

25

26

1  subrogation rights.[15] <u>Anhauser-Busch, Inc. v. Starley</u>, 28 Cal.

2  2d 347, 351-52 (1946); <u>Greene v. M & S Lumber Co.</u>, 108 Cal.

3  App. 2d 6, 11 (1951); <u>Lebet v. Cappobaicho</u>, 38 Cal. App. 2d

4  771 (1940); <u>see also</u> <u>Progressive West Ins. Co.</u>, 135 Cal. App.

5  4th at 273 (when insurer has subrogation right, it can either

6  interplead itself into the suit brought by the insured against

7  the wrongful third party "or wait to seek reimbursement under

8  the language of its policy from the insured to the extent that

9  the insured recovers money from the third party").[16]

10      Although the collateral source rule has been held

11  inapplicable to actions for breach of contract, <u>Plut v.</u>

12  <u>Fireman's Fund Ins. Co.</u>, 85 Cal. App. 4th 98, 107-109 (2001),

13  that exception seem inappropriate here.  In <u>Plut</u>, the court

14  held that plaintiff could not receive a damages award for

15  breach of contract against his insurance company when he had

16  already received more than the amount of damages he sought

17  from his settlement with the defendant in a separate, but

18  factually related, suit. 85 Cal. App. 4th at 107-109. To hold

19  ───────────────

20      [15]Access asserts in its reply that the question of who is the
real party in interest in the instant action for recovery of the

21  reinsurance payments is resolved by the choice of law provisions
in the reinsurance contracts.  Access has cited no authority for

22  this proposition nor has the court discovered any.  Access's
position is particularly confused since, in its motion, Access

23  relied on California law and expressed to the court that "it is not
necessary for this Court to analyze choice of law" on this issue.

24  Mot. for Summ. J. at 31 n. 9.

25      [16]Lincoln also cites <u>Employers Mut. Liab. Ins. Co. v. Tutor-
Saliba Corp.</u>, 17 Cal. 4th 632, 639 (1999), for this rule.  That

26  case appears inapplicable, as its holding was based on California's
workers compensation statute.

1   otherwise would permit the plaintiff double recovery, which

2   the court considered antithetical to the purpose of a damage

3   award for breach of contract, which is to make the plaintiff

4   whole. Id.

5       Here, that concern is not present.  The agreement between

6   Lincoln and its reinsurers (the clash reinsurance agreement)

7   required Lincoln to seek reimbursement "on account of claims

8   and settlements involving reinsurance hereunder" and to

9   enforce this right for the purpose of reimbursing the

10  reinsurers.[17] Depo. Exhibit 77 In Support of Pl.'s Opp. to Mot.

11  for Summ. J. at 8.  Similarly, in its Quota Share

12  Reimbursement Agreement with Kingsway Reinsurance Corporation,

13  Lincoln agreed to reimburse Kingsway for any recovery Lincoln

14  obtained, "in proportion to [the parties'] respective interest

15  in the loss." Depo. Exhibit 121 In Support of Pl.'s Opp. to

16  Mot. for Summ. J. at 11.  Consequently, since California law

17  permits the insured to seek recovery on behalf of its insurer

18  in the insured's name, see, e.g., Lebet, 38 Cal. App. 2d at

19  773, and if Lincoln is required to reimburse its reinsurers

20  for any recovery it obtains, Lincoln should not be barred from

21  recovering an amount at least equal to that which it has

22  received by its reinsurers.

23

---

24      [17]Although Access observes that this agreement is governed by
    Illinois law and if Illinois law in fact applies, see note 12
25  supra, Access offers no authority under Illinois law that would bar
    the reinsurers from assigning their rights to recovery to Lincoln,
26  as it appears was done here.

1          **2.    Lincoln's Loss Portfolio Transfer Agreement**

2          Access argues that Lincoln cannot recover because it has

3   already been reimbursed for its losses under a Loss Portfolio

4   Transfer Agreement (LPTA), a type of reinsurance agreement,

5   with Kingsway Reinsurance Corporation.   Lincoln disputes that

6   it has been reimbursed under the LPTA.

7          Access has tendered deposition testimony from Lincoln's

8   Chief Financial Officer, Gary Orndorff, to establish that

9   Lincoln has been fully reimbursed through the LPTA for its

10  settlement with the Diases and the costs of defending

11  Coleman.[18]  In his deposition, however, Orndorff did not

12  testify that Lincoln had in fact received reimbursement under

13  the LPTA for the Dias settlement and costs of defending that

14  suit. See Orndorff Depo. at 36:13-21.   In fact, he

15  specifically stated that he was not aware of the amount that

16  Lincoln was reimbursed under the LPTA for the Dias settlement

17  and defense expenses related to that suit. Id.   Later in the

18  deposition, Orndorff responded to questions about

19  reimbursement of Lincoln's reinsurers were Lincoln to recover

20  in the instant suit and Orndorff confirmed that any recovery

21  would go entirely to Lincoln's reinsurers, under either the

22  reinsurance agreements discussed *supra* or the LPTA. Id. at

23

24

      _____

25        [18]Access has not tendered the LPTA because it did not obtain
    it in discovery. See Access's Ex parte Application to Reopen Time
26  to File Discovery Motions, Oct. 10, 2008.

                                51

1  40:16-41:6.  Orndorff has since declared that Lincoln has not

2  been reimbursed under the LPTA.[19]  Orndorff Decl. ¶ 3.

3       In light of the evidence tendered, the court is not

4  persuaded that Lincoln has been reimbursed through the LPTA

5  for its settlement payment and costs for defending against the

6  Dias suit.  Orndorff's deposition testimony alone does not

7  establish this as his testimony may be understood to describe

8  generally the reinsurance agreements Lincoln has entered in

9  relation to both the Dias suit and the instant suit.  The

10 inferences Access has drawn from the deposition testimony are

11 contradicted by Orndorff's subsequent declaration.  Taken

12 together, the court cannot conclude that there is no genuine

13 issue of material fact that Lincoln has been fully reimbursed

14 for the recovery it seeks.[20]

15                       **IV. CONCLUSION**

16      For the reasons stated herein, defendant's motion is

17 GRANTED IN PART as described *supra*.  It is DENIED in all other

18 respects.

19      IT IS SO ORDERED

20      DATED:  January 22, 2009.

21

22
                                    LAWRENCE K. KARLTON
                                    SENIOR JUDGE
                                    UNITED STATES DISTRICT COURT

23      [19]Orndorff's additional statements describing the contents of
24 the LPTA are inadmissible under the best evidence rule. See Fed.
   R. of Evid. 1002.

25      [20]Even if it were, as the court explained *supra*, there appears
26 no legal impediment to Lincoln seeking recovery from Access for the
   purpose of vindicating its reinsurers' interests.